Robert K. **BETZ,** Appellant,

v.

**CHENA HOT SPRINGS GROUP, A Limited Partnership,** Appellee.

No. 6057.

Supreme Court of Alaska.

Dec. 23, 1982.

---

Robert C. Erwin, Erwin, Smith & Garnett, Anchorage, for appellant.

Mary A. Nordale, and Millard F. Ingraham, Faribanks, for appellee.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

BURKE, Chief Justice.

The Chena Hot Springs Group [CHS] owns and manages the Chena Hot Springs Resort. CHS is a limited partnership with three general partners, Mr. Betz, Mr. Kinn, and Mr. Cotting. Pursuant to procedures set out in the amended partnership agreement, Mr. Betz was voted out as a general partner on August 1, 1980. He now seeks to invalidate his forced retirement or to dissolve the partnership and apply a different valuation method in the buyout of his partnership interest. CHS seeks to uphold the retirement, to continue the business, and to enjoin Betz from communicating with its creditors.

Betz was personally liable for a significant amount of the debts incurred by CHS, and, as a result, he began communicating with CHS creditors to explain that he was no longer a partner and that the partnership would be dissolved because of his

retirement. The original complaint in this matter was initiated by CHS to enjoin Mr. Betz from communicating with its creditors and threatening its business interests. Mr. Betz counterclaimed to dissolve the partnership and to receive his partnership interest. Pending the outcome of the trial, the parties stipulated to a limitation on communication with creditors. On cross motions for summary judgment, the trial court ruled for CHS on all issues and enjoined Mr. Betz from communicating with CHS creditors. This appeal followed. We affirm.

I

■ In Alaska, a limited partnership is formed by meeting the prerequisites of AS 32.10.010.[1] The statute requires, among other things, that a limited partnership certificate be recorded before formation is considered complete. Betz first argues that, because the partnership failed to record the certificate, the requirements of AS 32.10.-080[2] prevail over the provisions in the partnership agreement. AS 32.10.080 provides that the partnership may not be continued upon the retirement of a general partner unless the right to do so is given in the certificate or a unanimous vote by the limited partners is taken. There being no certificate here and the partnership having taken only a two-thirds vote, Betz argues that his retirement pursuant to the agreement's procedures must be invalidated and the business discontinued. His argument presents us with the question of the effect of a partnership agreement upon the relationship of the partners when a limited partnership certificate is not filed.

■ The purpose of the recording requirement is to provide notice to the firm's creditors of a limited partner's circumscribed liability. *Brown v. Brown,* 15 Ariz. App. 333, 488 P.2d 689, 695 (Ariz.App.1971); *Klein v. Weiss,* 284 Md. 36, 395 A.2d 126, 136 (Md.App.1978); *Holvey v. Stewart,* 265

1. AS 32.10.010 of Alaska's Uniform Partnership Act provides:

(a) Two or more persons desiring to form a limited partnership shall

(1) sign and swear to a certificate, which shall state

(A) the name of the partnership,

(B) the character of the business,

(C) the location of the principal place of business,

(D) the name and place of residence of each member, general and limited partners being respectively designated,

(E) the term for which the partnership is to exist,

(F) the amount of cash and a description of and the agreed value of the other property contributed by each limited partner,

(G) the additional contributions, if any, agreed to be made by each limited partner and the times at which or events on the happening of which they shall be made,

(H) the time, if agreed upon, when the contribution of each limited partner is to be returned,

(I) the share of the profits or the other compensation by way of income which each limited partner shall receive by reason of his contribution,

(J) the right, if given, of a limited partner to substitute an assignee as contributor in his place, and the terms and conditions of the substitution,

(K) the right, if given, of the partners to admit additional limited partners,

(L) the right, if given, of one or more of the limited partners to priority over other limited partners, as to contributions or as to compensation by way of income, and the nature of such priority,

(M) the right, if given, of the remaining general partner or partners to continue the business on the death, retirement or insanity of a general partner,

(N) the right, if given, of a limited partner to demand and receive property other than cash in return for his contribution;

(2) file the certificate for record in the office of the recorder for the recording district in which the limited partnership is located.

(b) A limited partnership is formed if there is a substantial compliance in good faith with the requirements of (a) of this section.

2. AS 32.10.080 provides:

*Rights, powers and liabilities of general partner.* A general partner has all the rights and powers and is subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners may not

. . . .

(7) continue the business with partnership property, on the death, retirement or insanity of a general partner, unless the right so to do is given in the certificate.

Or. 242, 509 P.2d 17, 18 (1973). When a certificate is not filed, most courts hold that a general partnership is formed, with each partner being fully liable for debts of the partnership. *See, e.g., Peerless Mills, Inc. v. American Telephone & Telegraph Co.,* 527 F.2d 445, 448–49 (2d Cir.1975); *Klein v. Weiss,* 395 A.2d 126 at 136; *Dwinell's Central Neon v. Cosmopolitan Chinook Hotel,* 21 Wash.App. 929, 587 P.2d 191, 195 (Wash. App.1978). While a partner's rights vis-a-vis a creditor may be affected, failure to record the certificate does not, in and of itself, alter the rights of a partner vis-a-vis other partners as set out in a partnership agreement. *Brown,* 488 P.2d at 695; *Hoefer v. Hall,* 75 N.M. 751, 411 P.2d 230, 233 (N.M.1965), *reh'g denied,* 75 N.M. 756, 411 P.2d 233 (1966).

The failure to record the certificate, then, does not void the continuation requirements of the limited partnership agreement and the partners must be bound by the agreement in their relations among one another. The agreement here provides that upon notice by the general partners of their intent to continue the business, and a two-thirds vote of approval by the limited partners, the business may be continued. Thus, the requirements of AS 32.10.080 need not be followed. The record indicates that the vote to continue the partnership was taken in accordance with the procedures set forth in the partnership agreement. This being the case, the partnership may continue.

Betz next argues that the partnership agreement provides that the vote to continue may be taken only when a general partner dies, is incapacitated, or voluntarily retires. Because it does not expressly provide for continuance when a general partner is involuntarily retired, he argues that the partnership must be dissolved upon his retirement. This argument requires that we interpret the original agreement in light of its amendment. The original partnership agreement of August 1, 1977 provided that, if a general partner voluntarily retired, the partnership would be dissolved unless the remaining general partners notified the limited partners of their intention to continue the business and two-thirds of the limited partners agreed to continuance.[3] These procedures did not include a means of continuing the business upon involuntary retirement of a general partner.

To set out the procedures for involuntary retirement of a general partner and to provide a measure for the outgoing partner's interest, the partnership agreement was amended on December 31, 1978.[4] The amendment "amends and supplants" the 1977 agreement, but unfortunately does not specifically amend the original continuance procedures to provide for a continuance

---

**3.** Section 13 of the original agreement provided:

> 13. *Death, incapacity, retirement.* Upon the death, incapacity or retirement of a general partner, the partnership shall be dissolved and terminated; provided, however, that the remaining partners may agree to continue the partnership in accordance with the following provisions:
>
> . . . .
>
> (d) In the event that a general partner duly gives written notice of his intention to retire, or dies or becomes incapacitated, and there shall remain a general partner or partners, the partnership shall be dissolved and terminated unless
>
> (i) the remaining general partner or partners, within ninety days after such notice has been given, or such death or incapacity has occurred, shall have notified the limited partners of the intention of remaining general partner or partners to continue the partnership business, and

> (ii) two-thirds of the limited partner interests, within thirty days of the receipt of such notice of intention to continue, shall have agreed to such continuance of the business.

**4.** The amendment provided, in part:

> 4. *Involuntary retirement [and indemnification].* If a majority of the general partners determines that it is in the best interest of CHS Group that a general partner be required to retire as a general partner, and that determination is supported by the affirmative vote of two-thirds or more of the limited partner interests, that general partner shall retire. If involuntary retirement occurs, the remaining general partners shall, in the manner by which indemnification was given to Michael McCrackin upon his withdrawal as a general partner, indemnify the retired general partner against liabilities existing by reason of his former status as a general partner.

vote upon the involuntary retirement of a general partner.

Given such an ambiguity in the agreement, the primary function of judicial interpretation should be to ascertain and give effect to the intent of the parties. *Wright v. Vickaryous,* 598 P.2d 490, 497 (Alaska 1979); *Western Airlines, Inc. v. Lathrop Co.,* 535 P.2d 1209, 1214 (Alaska 1975). Betz argues that this ambiguity prevents the application of the continuance procedures for voluntary retirement to his involuntary retirement. We disagree.

■ The purpose of the original continuance procedures was to provide a means of continuing the business should a general partner voluntarily retire. The purpose of the amendment was to provide for the involuntary retirement of a general partner. The intent of the parties to permit continuation of the partnership upon involuntary retirement is clear. Had the firm intended automatic dissolution upon a general partner's involuntary retirement, the elaborate buyout provisions in the amendment would have been unnecessary. The provisions comprehend only one intention: that the partnership would continue and the remaining partners would purchase the retiring partner's interest. A court should not interpret an agreement in a manner which would give meaning to one part of an agreement at the cost of annulling another part. *McBain v. Pratt,* 514 P.2d 823, 828–29 (Alaska 1973). To accept Betz's reasoning here would be to annul the buyout provisions which clearly contemplate continuance of the partnership.

■ Betz also argues that the partnership did not show reasonable cause to retire him and, therefore, the retirement decision should be invalidated. The partnership agreement, as amended, does not require that reasonable cause be shown in a retirement vote. Rather, the agreement permits the majority general partners to involuntarily retire a general partner if they determine it to be in the "best interest" of the firm, provided two-thirds of the limited partners approve the decision.

Betz would have us imply a reasonable cause requirement. It is common and acceptable, however, for a partnership to permit retirement without a showing of reasonable cause. *Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573, 576 (N.Y.Ct.App.1977). As with other business management decisions, the determination to retire a partner properly lies with the judgment and control of the general partners. Necessarily, such a decision is predicated upon the weighing and balancing of disparate considerations to which the court does not have access. Absent bad faith, breach of a fiduciary duty, or acts contrary to public policy, we will not interfere with the management decisions of the firm.

■ Betz next argues that CHS improperly valued his partnership interest upon his retirement and seeks fair market valuation. We disagree. The amendment to the partnership agreement explicitly provides for the valuation of a partnership interest upon a general partner's involuntary retirement, stating that "[t]he general partners desire to specify the price to be paid a retiring . . . general partner, and avoid the necessity of further agreement."[5] The method selected

5. The amendment provided for valuation as follows:

> Paragraph 13 of the CHS Group Limited Partnership Agreement [the original agreement] covers the contingencies of death, incapacity or retirement of a general partner. Paragraph 13(e)(i) grants to general partners remaining after the death, incapacity or retirement of a general partner the right to purchase the general partner interest of the retiring, deceased or incapacitated general partner "upon such terms and conditions as they and the retiring partner or the legal

> representative or representatives of the deceased or incapacitated partner may agree." The general partners desire to specify the price to be paid a retiring, deceased or incapacitated general partner, and avoid the necessity of further agreements regarding a subject which is susceptible of present agreement.
>
> (a) *Death, incapacity or retirement prior to December 31, 1983.* If a general partner . . . retires (either voluntarily or involuntarily) on or before December 31, 1983, that general partner . . . shall sell to the remaining gener-

does not permit fair market valuation. Rather, the firm used a formula based on original value of the partnership interest, for which a partner took out a promissory note, repaying the partnership by performing management services. Applying this formula, the firm determined Betz's interest to be a paid limited partnership interest worth $55,692.80 which was freely alienable at a potentially higher market value. Betz has provided no valid reason why he should not be bound by these explicit provisions. The valuation method does not appear to be applied in bad faith, has not been shown to have achieved an unconscionable result, and is otherwise not contrary to public policy. *See Gelder Medical Group v. Weber*, 41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573 (N.Y.1977). We therefore decline to interfere with the agreement between the parties and hold that Betz must be bound by the agreement's valuation provisions.

## II

■ After his involuntary retirement, Betz sought to inform CHS creditors that he was no longer a partner of CHS and that CHS would be dissolved. Ostensibly, his motivation was to prevent personal liability for debts of the firm which he incurred. The trial court enjoined him from making such communications.[6] He argues on appeal that the injunction operates as a prior restraint on his right to free speech and seeks the injunction's removal.

We recognize that the injunction may be characterized as a prior restraint on Betz's right to free speech. We also are aware that CHS has a remedy at law by seeking

al partners, and those general partners shall purchase (on terms identical to those provided to the deceased, incapacitated or retired general partner), that percentage of the general partner interest of the ... retired general partner derived by multiplying the number of months remaining during the period commencing on the first day of the month following the month during which the general partner ... was involuntarily retired and terminating on December 31, 1983, by .0794 percent, at a cost of $2,064.00 for each such month. That price is equivalent to the original cost of the general partner interest, namely, $26,000 per one percent general partner interest.

If a general partner ... retires (either voluntarily or involuntarily) on or before December 31, 1983, and if on the date of ... retirement that general partner has pre-paid a portion of the principal balance of his note to the limited partnership, the paid-up general partner interest of that general partner shall be converted to a paid-up limited partner interest equivalent in percentage to such general partner interest.

If a general partner ... retires (either voluntarily or involuntarily) on or before December 31, 1983, and if on the date of ... retirement that general partner has not pre-paid any or all of that portion of the principal balance of his note to the limited partnership which he was under the terms of such note entitled to pre-pay, such general partner ... shall be entitled to exercise one of the following two options: (1) he may pre-pay all or part of that portion of the unpaid principal balance of his note which on the date of ... retirement he was entitled to pre-pay, and the general partner interest thereby pre-paid shall be converted to a paid-up limited partner interest equivalent in percentage to such general partner interest, and the portion of the unpaid principal balance which on the same date the general partner could have pre-paid, but now elects not to prepay, shall be purchased by the remaining general partners, on terms identical to those available to the deceased, incapacitated or retired partner; or (2) he may require the remaining general partners to purchase all of such general partner interest, on terms identical to those available to the deceased, incapacitated or retired partner on the date of ... retirement.

. . . .

(c) *Time within which options must be exercised.* All options available to a[n] ... involuntary retired general partner ... shall be exercised not later than 60 days following the occurrence of the event which entitles that person to exercise the option. A general partner who retires voluntarily shall exercise his option at the same time as he gives notice of his decision to retire.

6. The injunction provides:

Defendant, Robert K. Betz, is enjoined from communicating, orally or in writing, to creditors and vendors of plaintiff, Chena Hot Springs Group, that Chena Hot Springs Group, a Limited Partnership, is terminated, is or should be winding up, or that Robert K. Betz is no longer liable on any notes or other obligations of Chena Hot Springs Group that he has previously guaranteed [*sic*] or for which he has previously assumed liability.

damages if its business interests are actually injured.

 We conclude, however, that the trial court acted properly. Betz is personally liable on debts he incurred while acting as a general partner and notice to creditors of his retirement is insufficient to cut off liability. *Detrio v. United States,* 264 F.2d 658, 661 (5th Cir.1959); *Martinez v. McGregor-Doniger Inc.,* 173 A.2d 221, 221–22 (Ct. App.D.C.1961); *Texas Co. v. Genetski,* 291 Mich. 569, 289 N.W. 257, 258 (Mich.1939). The business is apparently healthy and it is unlikely creditors would need to look to Betz for compensation. And, as decided above, the partnership may be continued and any statement by Betz that his retirement would force dissolution would be false.[7]

Looking at the nature of the speech itself, we do not consider it to be speech which is personal, artistic, or political, or speech which involves issues of public concern around which lively debate should take place. We consider the injunction narrowly drawn, as it only prevents communication to creditors regarding liability for debts or the possible dissolution of the partnership. The injunction does not require active supervision of the court or necessitate undue intervention into personal lives of those affected by the injunction. Also, the speech could easily damage the business interests of CHS by negatively affecting its credit rating, its ability to attract investors, and its ability to otherwise carry on its business. A damage remedy based on such injury would necessarily be difficult to measure. To permit Betz to continue with such injurious speech would only encourage further litigation.

For these reasons, we conclude that the trial court did not abuse its discretion in granting the injunction. *See Douglas v. Beneficial Finance Co. of Anchorage,* 469 F.2d 453, 454 (9th Cir.1972); *State of Alaska v. Carter,* 462 F.Supp. 1155, 1158 (D.C. Alaska 1978); *Powell v. City of Anchorage,* 536 P.2d 1228, 1229 n. 2 (Alaska 1975). We also conclude that the trial court's grant of summary judgment was correct. There were no genuine issues of material fact to be litigated and CHS was entitled to judgment as a matter of law. *See Whaley v. State,* 438 P.2d 718, 720 (Alaska 1968).

The judgment of the superior court is AFFIRMED.

---

**7.** Among other things, the superior court enjoined Betz from telling CHS's creditors that the partnership "is or *should be* winding up." *See* note 6, supra (emphasis added). We interpret this language as enjoining only communications indicating that the partnership is or *soon will be* winding up. To the extent that it might be read as prohibiting Betz from expressing his opinion that CHS is morally, if not legally, obligated to dissolve and wind up the partnership, the injunction would violate Betz's right to free speech. The phrase, "or should be," therefore, must be read in the narrow sense that we have given to it.