United States Court of Appeals,
Fifth Circuit.

No. 92-2415.

EXXON CORPORATION, Plaintiff-Appellee,

v.

Cliff BURGLIN, et al., Defendants-Appellants.

Oct. 21, 1993.

Appeals from the United States District Court for the Southern District of Texas.

Before GARWOOD, DAVIS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Cliff Burglin, Charles Hamel, Thomas J. Miklautsch, Weldtest, Inc., and CFM Corp., former limited partners in a limited partnership in which Exxon Corporation ("Exxon") was the general partner, appeal summary judgment in an action by Exxon for declaratory judgment concerning its 1989 purchase of the defendants' interests. Finding no genuine issue of material fact regarding the limited partners' claim that Exxon breached its duty to disclose certain information vital to the evaluation of their interests, we affirm except as to the district court's award of full attorneys' fees.

I.

A.

Miklautsch acquired two North Slope oil and gas leases in the Point McIntyre Field of Alaska, ADL 34622 and 34623 (the "leases"), in 1967 for $4,787. He subsequently assigned partial interests in the leases to each of the defendants.[1]

The defendants sold partial interests in the leases to various third parties over the years. In 1968, Miklautsch and Burglin sold partial interests to General American Oil Company of Texas, which assigned part of its interest to Humble Oil Company (now Exxon). In 1975, the defendants sold an undivided one-half interest to Gulf Oil Company ("Gulf") pending resolution of disputes over

---

[1]Miklautsch assigned a 207 interest to Burglin in 1968, a 107 interest to Hamel in 1975, and his remaining interests to Weldtest, Inc. (a company he and his wife owned and controlled), in 1987. Weldtest subsequently was acquired by CFM Corp.

the parties' ownership rights. The lawsuits arising from these disputes resulted in the 1977 settlement (the "Settlement Agreement") at issue in this case.

One aspect of the Settlement Agreement was the creation of a limited partnership (the "Partnership Agreement") known as "Gulf MBH-Alaska, Ltd.," consisting of Gulf as general partner with 807 beneficial ownership and Miklautsch, Burglin, and Hamel as limited partners with ownerships of 14.47, 3.67, and 27, respectively. Through 1978, Gulf drilled two wells on the leases, Point McIntyre Wells No. 1 and No. 2, neither of which proved productive.

Chevron Oil Company ("Chevron") acquired Gulf in 1985 and sold its interest as general partner to Exxon in 1987. Exxon offered to purchase the limited partners' interests at that time, but the offer was rejected. Nevertheless, the limited partners consented to Exxon's assuming the role of general partner, provided Exxon assumed Chevron's existing duties.[2]

In April 1988, after completing the third well on the field ("Well No. 3"), ARCO[3] filed a "Statement of First Discovery of Oil and Gas in Commercial Quantities in a Geological Structure" (the "Statement"). Exxon confirmed that it was a participant in this find. The initial findings indicated Well No. 3 was capable of producing 1,500 barrels of oil per day. Subsequent testing in February and March 1989 indicated a productive capacity of 3,700 barrels per day. Exxon informed Burglin that it was "encouraged" by Well No. 3 but did not disclose the filing of the Statement, the well's productivity, or estimates of the reserves.

On July 18, 1988, Burglin indicated that he might sell his interest in the leases. On August 12, he requested that Exxon make an offer for his interest or permit him to solicit other offers, pursuant to section 9.02(b) of the Partnership Agreement. For the next seven months, Exxon and

---

[2]Section 9.07 of the Partnership Agreement states that "[w]ithout the consent of all of the Limited Partners, the General Partner may not assign its managerial rights...." In a December 29, 1987, letter to the Limited Partners, Exxon stated,

> Exxon seeks your consent to this Assignment and substitution of General Partner in order to consolidate ownership of these Leases, which we feel is essential to facilitate exploratory drilling operations. Exxon is prepared to assume and agrees to fulfill Chevron's role as General Partner.

[3]Both Well No. 3 and Point McIntyre Well No. 4 ("Well No. 4") were located on an adjoining lease. Well No. 3 was drilled by Atlantic Richfield Co. ("ARCO").

Burglin were unable to agree on a purchase price, and Burglin sought outside offers and consulted experts regarding the value of the leases.

On April 7, 1989, Exxon offered Burglin $1.21 million for his interest and proportional amounts for each of the other limited partners' interests. This offer stipulated that the parties entered the transaction "based on data available today without knowing the results" then in progress. The offer also granted the limited partners the option (the "Third-Party Option") to "select a mutually acceptable consultant to make an independent assessment of Exxon's offer," the cost of which would be shared by Burglin and Exxon.

Burglin, Miklautsch, and Hamel accepted Exxon's offer without obtaining an independent valuation of their interests or awaiting the results of Well No. 4,[4] which Exxon completed in July 1989. The success of this well significantly increased the expected value of the field.

### B.

The limited partners brought suit in Alaska, alleging, *inter alia,* misrepresentation and fraud and charging that Exxon had breached its fiduciary duty by failing to disclose information necessary for the valuation of their interests. Exxon then brought a declaratory action in Texas pursuant to the Texas Uniform Declaratory Judgments Act ("TUDJA"), TEX.CIV.PRAC. & REM.CODE §§ 37.001-.011 (West 1985), to determine its duties under the Partnership Agreement. The limited partners removed the case to federal court and, after extended discovery, Exxon moved for summary judgment. The district court granted summary judgment, holding that Exxon had no duty to disclose information it considered confidential. The court also awarded full attorneys' fees to Exxon.

### II.

This court reviews a grant of summary judgment *de novo. Hanks v. Transcontinental Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir.1992). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

---

[4]Burglin requested that Exxon close the deal before April 15, 1989, in order to accommodate his tax needs. Miklautsch and Hamel also had needs for ready cash at the time.

to a judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Hanks,* 953 F.2d at 997.

We begin our determination by consulting the applicable substantive law to determine what facts and issues are material. *King v. Chide,* 974 F.2d 653, 655-56 (5th Cir.1992). We then review the evidence relating to those issues, viewing the facts and inferences in the light most favorable to the non-movant. *Id.* If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

## A.

Our first concern in this partnership dispute is to determine the applicable law. Where federal court jurisdiction is based solely upon diversity of citizenship, we must follow the forum state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Texas choice of law rules recognize the parties' autonomy to select the law to be applied to their contract. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 677 (Tex.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). Section 11.02 of the Partnership Agreement specifically provides that Alaska law governs all rights and liabilities between the parties. Pursuant to this clause, the district court correctly applied Alaska law to the substantive claims.[5]

## B.

Under Alaska law, a general partner stands in a fiduciary relationship with the limited

---

[5]Exxon suggests that *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984), requires the application of Texas law because the Settlement Agreement was predominately negotiated, drafted, and executed in Texas and involved several Texas companies. In *Duncan,* the court adopted the "most significant contacts" methodology for resolving conflicts of law in all cases "except those contract cases in which the parties have agreed to a valid choice of law clause." *Id.* at 421. A Texas court will enforce a contractual choice of law provision unless (1) the contract bears no reasonable relation to the chosen state or (2) the law of the chosen state violates a fundamental public policy of Texas. *DeSantis,* 793 S.W.2d at 677. Exxon could not seriously contend that Alaskan oil leases do not bear a reasonable relation to Alaska or that Alaska contract law offends the public policy of Texas.

partnership and thereby owes "a fiduciary duty ... to disclose information concerning partnership affairs." *Parker v. Northern Mixing Co.,* 756 P.2d 881, 894 (Alaska 1988); ALASKA STAT. § 32.05.150 ("Partners shall provide on demand true and full information of all things affecting the partnership to any partner...."). The partnership agreement, however, will determine the extent of disclosure required between partners and whether a failure of disclosure constitutes fraud or breach of the agreement.

"Partner fiduciary duties are aspects of the "standard form' of partnership. As with respect to the other rights and duties among the partners, the partners may alter the standard form fiduciary duties to suit their particular relationship." 2 ALAN R. BROMBERG & LARRY E. RIBSTEIN, BROMBERG AND RIBSTEIN ON PARTNERSHIP § 6.07(h), at 6:89 (1991); *id.* § 6.06, at 6:67 (arguing that "parties could at least circumscribe the right to information"); *id.* § 6.05(d), at 6:59 (partners can bargain over access to information).

Courts should allow parties to define the means of disclosure as the management of a partnership necessarily involves "the weighing and balancing of disparate considerations to which the court does not have access." *Betz v. Chena Hot Springs Group,* 657 P.2d 831, 835 (Alaska 1982). In *Betz,* a provision in a partnership agreement allowed a majority of the general partners to "involuntarily retire" a fellow general partner without dissolving the partnership if they found "that it is in the best interests of [the partnership] that a general partner be required to retire." *Id.* at 834 n. 4. Instead of receiving a proportional share of the partnership, the involuntarily retired partner would receive compensation based upon an elaborate valuation formula stated in the partnership agreement. *Id.* at 836 n. 5. Upholding the provision, the court declared that "[a]bsent bad faith, breach of a fiduciary duty, or acts contrary to public policy, [Alaska courts] will not interfere with the management decisions of the firm." *Id.* at 835.

The settlement between the limited partners and Gulf sought to prescribe the General Partner's duty to disclose information to the limited partners in a manner consistent with the effective development of the leases. Section 4.02(a) of the Partnership Agreement gives the general partner the sole authority to manage and control the business of the partnership. As an aspect of this control,

section 4.02(b) restricts the limited partners' access to information, stating that "no Limited Partner shall have the right to any confidential information concerning the Leases."

Section 8.03 defines the limits on the general partner's duty to disclose information:

> The General Partner shall not be obligated to furnish any information concerning surface structure, reserves or other information concerning the Leases which the General Partner believes would be in the best interest of the Partnership or the General Partner to be kept confidential.

The second sentence of section 8.03, however, places some constraints on the General Partner's control over information:

> However, at least annually, the General Partner will furnish to the Limited Partners all nonconfidential information relevant to the evaluation of the Partnership Interest of each Limited Partner, such as reserves, projected rate of production, etc.

The first sentence of section 8.03 protects the interests of the partnership and the general partner. This provision recognizes not only the partnership's inherent need for secrecy to protect itself from outside competition but also the general partner's individual need to protect its interests from the limited partners. This is apparent in light of section 4.03, granting the limited partners the right to "engage in or own an interest in other business ventures engaged in the same or similar business as the Partnership." Since this provision abrogates the fiduciary duty of loyalty by allowing partners to compete with their partnership, it is reasonable to expect some limitation on the fiduciary duty of disclosure.

The Partnership Agreement was negotiated by highly sophisticated parties who bargained for the terms of the agreement at arm's length with the assistance of counsel. The limited partners received substantial sums of money for the relinquishment of their right to full disclosure. Under Alaska law, a court must give effect to the terms of the Partnership Agreement that unambiguously limit the duty of disclosure owed by the general partner to the limited partners.

C.

Under Alaska law, a general partner stands as a fiduciary to the limited partners; the contractual abrogation of some fiduciary duties does not relieve the general partner from other basic fiduciary duties, such as the duty of good faith and fair dealing. *Betz,* 657 P.2d at 835; *see also Wirum & Cash, Architects v. Cash,* 837 P.2d 692, 702 (Alaska 1992) (in cases of management

discretion and self-dealing, a higher standard of good faith, honesty, and fair dealing is applied); *see generally* Jason R. Erb, Note, *The Implied Covenant of Good Faith and Fair Dealing in Alaska: One Court's License To Override Contractual Expectations,* 11 ALASKA L.REV. ---- (forthcoming 1994). Exxon does not dispute this point; it merely asserts that there can be no violation of these implied fiduciary duties where a party's actions are authorized by the contract. *See Phillips v. Chevron U.S.A., Inc.,* 792 F.2d 521, 524-25 (5th Cir.1986); *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 955-60 (5th Cir.1981) (en banc), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). As the terms of the Partnership Agreement do not violate public policy and are not illegal or unconscionable, the only question is whether Exxon's actions were in accordance with the provisions of that agreement.

D.

Exxon's offer to buy out the limited partners was consistent with its contractual duty to provide nonconfidential information. Furthermore, the offer did not violate any implied duties, such as the duty of good faith and fair dealing.

1.

 The terms of the Partnership Agreement do not obligate Exxon to disclose nonconfidential information. Section 4.02(b) of the Partnership Agreement provides,

> Subject to Section 5.03(b) [sic], no Limited Partner shall have the right to any confidential information concerning the status of the Leases.

Section 8.03 states,

> [T]he General Partner shall not be obligated to furnish any information concerning subsurface structure, reserves or other information concerning the Leases which the General Partner believes would be in the best interest of the Partnership or of the General Partner to be kept confidential. However, ... the General Partner will furnish to the Limited Partners all nonconfidential information relevant to the evaluation to the Partnership Interest of each Limited Partner, such as reserves, projected rate of production, etc.

Only one possible meaning of these sections makes sense: The general partner must furnish the limited partners with information necessary to evaluate their interests, unless the general partner

believes the information is confidential.[6]

The general partner's belief is subject to the "reasonable discretion" requirement of section 3.02(a):

> For purposes of this Agreement, the determination of what is in the best interest of the Partnership shall be made by the General Partner in the exercise of its reasonable discretion and in light of its fiduciary capacity.

Thus, only in good faith may the general partner exercise its discretion to determine the best interests of the partnership. Under this interpretation, Exxon had no duty to disclose, prior to the offer, the information regarding Well No. 4.

The limited partners sought to introduce extrinsic evidence concerning the meaning of these provisions of the Partnership Agreement.[7] The extrinsic evidence is irrelevant, though, since the Partnership Agreement allows Exxon to define what information is confidential, subject only to a reasonable discretion standard. What the parties thought the term "confidential" meant is not relevant, as the contract allows Exxon to decide what information is in its best interest to keep confidential. Although this provision gives Exxon tremendous power, it is not inconsistent with its fiduciary responsibilities as the general partner, and a court must give effect to contract terms that unambiguously define the parties' rights under the contract.

---

[6]One could read the list of items following the words "such as" as a list of nonconfidential items relevant to the evaluation to the partnership interest. Thus, all items on the list would be defined as nonconfidential. But this interpretation contradicts the first sentence of § 8.03, listing these items as examples of confidential information. The items on the list following "such as" are examples of *relevant* information. Thus, each item of information, although relevant, was subject to the restriction of confidentiality: Only *nonconfidential* relevant information will be supplied.

[7]Alaska's parol evidence rule is somewhat peculiar. Under the rule, a court must determine (1) whether the contract was integrated, (2) what the terms of the contract mean, and (3) whether a prior agreement conflicts with the integrated writing. *Western Pioneer, Inc. v. Harbor Enters.,* 818 P.2d 654, 657 n. 4 (Alaska 1991). But "[e]xtrinsic evidence may always be received in resolving [the] first two inquiries." *Alaska Diversified Contractors v. Lower Kuskokwim Sch. Dist.,* 778 P.2d 581, 584 (Alaska 1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990). Only after the meaning is determined does the rule exclude prior agreements inconsistent with that meaning. *Id.*

> The Alaska Supreme Court admits this rule may be difficult to apply, as "evidence which is consulted to determine meaning may be the same evidence which is later excluded ... by the parol evidence rule." *Id.* We need not consider the application of Alaska's parol evidence rule here, though, because the Partnership Agreement allows Exxon to determine what information is confidential.

Thus, Exxon did not breach the Partnership Agreement in its purchase of the limited partners' interests. The terms of the agreement allow Exxon to determine the confidentiality of information, and Exxon was under no duty to disclose nonconfidential information.

2.

The limited partners claim that Exxon's offer violated the implied duties of good faith and fair dealing, honesty, and the duty to pay a fair price. We disagree. Exxon's offer to purchase the limited partners' interests was consistent with its implied fiduciary duties.

The Third-Party Option gave the limited partners the choice to await the results of Well No. 4 or to have an independent third-party consultant analyze Exxon's offer. Exxon described the Third-Party Option as a "no-lose" proposition for the limited partners. Exxon agreed to pay the purchase price by April 15, as agreed, but the consultant would have until June 30 to analyze the offer. If the consultant found the offer to be inadequate, the limited partners had the right, but not the obligation, to return the purchase price and rescind the sale.

The limited partners claim that the "no-lose" proposition was deceptive and unfair. The analysis of Exxon's offer involved the release of the confidential information concerning Well No. 3 and No. 4 and therefore was subject to ARCO's approval. Under the terms of the Third-Party Option, after the limited partners agreed to have a third-party consultant evaluate the lease interests, Exxon would be obligated to seek, in good faith, ARCO's approval of the release of the confidential information.

If ARCO would not agree to release confidential information, however, the limited partners thereby would have stipulated that the purchase price was fair. In other words, if the limited partners exercised the option, they assumed the risk that ARCO would not agree to release the information and that the purchase price, accordingly, would be declared fair without a third party's evaluation.

The Third-Party Option presented the limited partners with four choices: They could exercise the option and hope that ARCO agreed to release the data; they could wait until the results of Well No. 4 were available; they could accept the offer and waive their right to a third-party evaluation or the results of Well No. 4; or they could reject the offer. The fact that the limited partners were

financially inclined to accept the offer without the delay of the evaluation or of awaiting the results of Well No. 4 is irrelevant. Such a motivation for accepting the offer does not amount to coercion, unfair dealing, or bad faith by Exxon.

The limited partners were free to reject the offer. Likewise, the fact that the Third-Party Option may have subjected the limited partners to an unfavorable stipulation, had ARCO refused to reveal the confidential information, does not make the offer unfair. They still were free to reject the offer or await the results of Well No. 4.[8] Taking advantage of a party's inclination to accept an offer does not transform an *unfavorable* offer into an *unfair* one.

Also, the standard of conduct for a general partner is somewhat lower when acting in an adversarial relationship with the limited partners. In regard to the buyout offer, Exxon was not acting on behalf of the partnership, representing both its and the limited partners' interests. If it were, the duty of good faith and fair dealing necessarily would be high, to avoid the problem of a general partner's self-dealing.

In this case, however, Exxon was buying out the limited partners' interests. It is logical to expect that the relationship would be somewhat adversarial. The limited partners must have realized that Exxon would try to secure the best deal it could and that this goal was adverse to their interests.

The limited partners further contend that Exxon's offer and subsequent purchase of their interests violated the fiduciary duty to pay a fair price. This argument is also without merit. The duty to pay a fair price was abrogated specifically by section 9.02(b) of the Partnership Agreement, which provides, "[I]f the General Partner is interested in acquiring [the] interest, both shall negotiate in good faith in an attempt to arrive at mutually agreeable terms of purchase." Thus, Exxon was required only to bargain in good faith; when parties negotiate in good faith and reach a mutually agreeable purchase price, the result of such a transaction cannot be upset by appeal to the concept of an objectively "fair" price.

---

[8]The fact that the offer required the limited partners to pay half the price of the third-party consultant ($2,000) is a trivial consideration. That Exxon would require the limited partners to pay $1,000 for the consulting fee is simply irrelevant to whether Exxon breached the terms of the contract or any implied fiduciary duties.

If the price was not fair, the limited partners need not have accepted the offer. Exxon did not violate its obligation to negotiate in good faith by allegedly withholding valuable information that it was under no duty to disclose.

Thus, the offer was in conformance with the terms of the agreement. No provision of the agreement was violated by Exxon in its dealings with the limited partners. Moreover, Exxon breached no implied duty in its purchase of the limited partners' interests.

We express no opinion, however, on the limited partners' claims of affirmative misrepresentation and fraud, pending in their Alaska lawsuit. No part of this opinion should be read as sanctioning fraudulent conduct or misrepresentation. We read the district court's final judgment as reserving these issues. Summary judgment therefore is affirmed, preserving the issues of misrepresentation and fraud.

### III.

We review the award of attorneys' fees for abuse of discretion. *Atchison, Topeka & Santa Fe Ry. v. Sherwin-Williams Co.,* 963 F.2d 746, 751 (5th Cir.1992). The award of attorneys' fees is governed by the law of the state whose substantive law is applied to the underlying claims. *Kucel v. Walter E. Heller & Co.,* 813 F.2d 67, 73 (5th Cir.1987).

Exxon contends that even if Alaska law governs the substantive claims, Texas law should control the award of attorneys' fees, because suit was brought in Texas under the TUDJA. This position is inconsistent with *Kucel,* in which we held that in litigation construing a contract that contains a valid choice of law clause, the parties' choice of law governs both the interpretation of the contract and the award of attorneys' fees. *Id.* Bringing suit under the TUDJA should not alter this result. The TUDJA is merely a procedural device and does not confer any substantive benefits. *Housing Auth. v. Valdez,* 841 S.W.2d 860, 864 (Tex.App.—Corpus Christi 1992, writ denied).[9]

Under Alaska law, the district court has discretion to award attorneys' fees to the prevailing

---

[9]In addition, the Texas Legislature did not intend the TUDJA to govern attorneys' fees where a party "bring[s] a declaratory judgment action to determine rights already subject to determination in a pending suit." *Richter, S.A. v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 939 F.2d 1176, 1197 (5th Cir.1991) (quoting *Narisi v. Legend Diversified Invs.,* 715 S.W.2d 49, 51 (Tex.App.—Dallas 1986, writ ref'd n.r.e.)).

party. ALASKA CIV.P.RULE 82(a). This statute is not intended to shift the entire cost of the litigation, but rather to provide "partial compensation" for the successful litigant. *Atlantic Richfield Co. v. State,* 723 P.2d 1249, 1252 (Alaska 1986). The statute provides a fee schedule for determining the award for a party recovering a money judgment. Where the prevailing party does not receive a money judgment, it is entitled only to partial attorneys' fees "in a reasonable amount." *Id.* at 1251.

Absent bad faith or vexatious conduct by the losing party, "an award of full attorney's fees is manifestly unjust, and it constitutes an abuse of discretion." *Id.* at 1252. Therefore, we vacate the district court's grant of full attorneys' fees to Exxon and remand with instructions to reconsider attorneys' fees in light of *Atlantic Richfield.*[10]

IV.

Summary judgment is AFFIRMED on the breach of duty claims. The award of full attorneys' fees is VACATED, and this matter is REMANDED for reconsideration of attorneys' fees.

---

[10]The Alaska Supreme Court specifies several factors for the trial court to consider in setting attorneys' fees "in a reasonable amount," including the nature and value of the services rendered, the duration and complexity of the litigation, the novelty of the issues presented, the amount in controversy, and the prevailing party's timekeeping procedures. *Atlantic Richfield,* 723 P.2d at 1252.