# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

No. 99-20725

JAMES P. HOLLIS,

Plaintiff-Appellee,

versus

DAN H. HILL,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

November 17, 2000

Before POLITZ, JOLLY, and BARKSDALE, Circuit Judges.

POLITZ, Circuit Judge:

James P. Hollis seeks a court-ordered buy-out of his 50% interest in a Nevada corporation. The district court found that Dan Hill, holder of the other 50% interest, breached the fiduciary duty he owed to Hollis and ordered a buy-out of Hollis' shares based on the corporation's value more than one year prior to the date of judgment. Hill timely appeals. For the reasons assigned, we affirm in part and vacate and remand in

part.

## BACKGROUND

In early 1995, Hill and Hollis jointly founded First Financial USA, Inc. (FFUSA), a Nevada corporation which marketed first lien mortgage notes and other non-security financial products. All of the whole mortgage notes placed by FFUSA were obtained from and serviced by South Central Mortgage.[1] Hill and Hollis also owned equal shares of First Financial United Investments, Ltd., L.L.P. (FFUI), a Texas limited liability partnership organized in June 1996 to sell securities products as a broker/dealer. This action focuses on the parties' rights and obligations respecting FFUSA.

Hill was a 50% owner of FFUSA, was a director and served as its president, and operated its Houston office. He testified his duties were "to set up the company, set up all the administration, hire the personnel, set up the tracking systems, support reps, recruit reps, and generally help in the strategizing of the company direction." Hollis owned the other 50% interest in FFUSA, was a director and served as its vice

---

[1]Hill explained that FFUSA relied heavily on South Central Mortgage for two reasons. Hill's experience with South Central and his relationship with its president, Todd Etter, persuaded him that the company could be relied upon to service the notes properly. This was particularly important in the event that a note was defaulted. In addition, South Central was among the few firms outsourcing the marketing of its notes. Most other mortgage companies preferred to keep the entire operation in-house by maintaining their own sales forces. As FFUSA was strictly a marketing company, few other firms would complement its business as well as South Central.

president. Hollis operated its Melbourne, Florida office, with duties including recruiting, training and supporting representatives in their marketing efforts, seeking out new revenue sources, and participating in management. Their wives completed the board of directors and were employed by the firm.

From its inception through 1997, FFUSA did very well financially and paid substantial salaries to Hill and Hollis. In early December 1997, however, Hill began to complain that Hollis was not carrying an equal share of the firm's work load and made known his belief that Hollis was getting more money than he deserved. He stopped paying Hollis' salary. Hollis proposed several ways to resolve the dispute, including mediation, relocating to Houston, placing a disinterested person on the board to break the deadlock, or exchanging his interest in FFUI for Hill's interest in FFUSA. Hill rejected all of the proposals. In March 1998, Hill proposed to buy Hollis' interest in FFUSA in exchange for a ten-year, $1.5 million consultant agreement.[2] When Hollis rejected the proposal, Hill threatened to close FFUI and establish his own broker/dealer business.

Meanwhile, Hill took FFUSA's annuity business and, without Hollis' knowledge, placed it into a sole proprietorship called "Dan Hill d.b.a. First Financial

_____

[2]A valuation report by Dixon & Company dated December 17, 1997, estimated the company's value to be between $1.3 million and $3.5 million.

U.S.A." Hill explained that this move was in response to a cease and desist letter FFUSA received from the State of Texas prohibiting it, as a corporation not licensed in Texas, from marketing insurance products. Hill, a resident of Texas, created the sole proprietorship so that FFUSA could continue the marketing of insurance products and executed a contemporaneous assignment transferring all accounts of the sole proprietorship back to FFUSA. Hill charged the corporation a fee for providing this "service." He later split this fee with Hollis.

Hill also stopped sending FFUSA financial reports to Hollis. On May 11, 1998, Hollis visited the Houston office of FFUSA and FFUI and requested copies of financial reports and other documents. Hill refused, claiming that he and the key Houston office employees had appointments that day and that they did not have time to go over the books with Hollis. Hollis later, through his attorney, asserted his right as a shareholder of FFUSA and limited partner of FFUI to inspect the books and records of the two firms. On the eve of the inspection, Hill and Hollis agreed to negotiate. Hollis testified that the result was an agreement under which Hill would acquire Hollis' interest in FFUI and would draw a salary of $200,000 from FFUSA, and Hollis would draw an annual salary of $120,000 therefrom for encouraging FFUSA's representatives to produce business and for supplying them with the necessary paperwork. Under the agreement, both men retained a 50% interest in FFUSA.

By August 1998, the tension between Hollis and Hill resurfaced. Hill stopped sending company reports to Hollis and unilaterally undertook a number of measures he claims were intended to lower the firm's costs, including reducing officer salaries by 50%. On October 16, 1998, he informed Hollis that he had decided to reduce his own annual salary to $80,000 and would reduce Hollis' salary to zero dollars. In a November 1998 letter, Hill told Hollis that: "[his] position as an inactive officer commands no salary;" phone service in the Florida office would be canceled; and the lease for the Florida office would be terminated. Hollis was informed that he was no longer authorized to use the company cellular phone and that FFUSA would no longer pay the expense of his leased vehicle. Hill terminated the employment of Hollis' wife. Hill significantly reduced costs in the Houston office, as well. He testified that cost cutting measures were necessary because he had received word from Etter that South Central Mortgage would likely not be able to provide FFUSA the steady stream of business it had in the past. He conceded, however, that he had made very little effort to produce new lines of business for FFUSA.

Hollis filed the instant action on December 8, 1998, alleging shareholder oppression. A few weeks later Hill terminated Hollis as vice-president and eliminated all of his company benefits. Hollis continued as corporate secretary, board member, and 50% shareholder. The financial condition of FFUSA worsened and, according to

Hill's expert, the firm had decreased in value to $100,000 by May 11, 1999. On April 30, 1999, Hill, acting through his attorney, made an unsuccessful "capital call" on Hollis.

The district court, applying Nevada law, concluded that Hill's conduct was oppressive and ordered him to buy Hollis' shares in FFUSA. The court cited the capital call and the firing of Hollis as the "easiest objective data" supporting the claim of oppression, and added that the "more egregious" act of moving the annuity business to the Hill-sole-proprietorship should not have occurred without the approval of the board of directors. The court also suggested that Hill's interference with the flow of information to Hollis and his threat to start a business that competed with FFUI were oppressive acts.[3] The court ordered Hill to purchase Hollis' shares for $667,950, which represented the value of the corporation on February 28, 1998, the date the court found that the oppression began. Adding attorney's and expert's fees, the total award to Hollis was $792,915. This appeal followed.

## ANALYSIS

---

[3]In ruling from the bench, the district court opined that the absence of a non-compete agreement was of no consequence and that Hill's actions were subject to the corporate opportunity doctrine. Any finding of the breach of duty of loyalty based on usurpation of a corporate opportunity necessarily related to opportunities available to FFUI. Hollis has made no claims as an FFUI shareholder and has not claimed that Hill usurped a corporate opportunity. The trial court appropriately did not specifically find a violation of the corporate opportunity doctrine. We assume that the district court intended this discussion to support its finding of oppression.

We apply Texas law in this diversity action.  Texas, like most other states, follows the "internal affairs doctrine."  That is, the internal affairs of the foreign corporation, "including but not limited to the rights, powers, and duties of its board of directors and shareholders and matters relating to its shares," are governed by the laws of the jurisdiction of incorporation.[4]  Nevada corporate law therefore determines the existence and scope of duties between Hollis and Hill.  "In order to determine state law, federal courts look to final decisions of the highest court of the state.  When there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide."[5]

Generally, in determining what a state's highest court would hold with respect to a particular issue, "we may consider relevant state precedent, analogous decisions, considered dicta, scholarly works and any other reliable data."[6]  In the present situation, however, the most reliable source of assistance, namely dispositive decisions from the Nevada courts, are non-existent.  In addition, the corporate law of Nevada gives limited guidance, and determining where the Nevada Supreme Court would look

---

[4]TEX. BUS. CORP. ACT ANN. art. 8.02A (Vernon 1980).

[5]**Transcontinental Gas Pipeline Corp. v. Transportation Insur. Co.**, 953 F.2d 985, 988 (5th Cir. 1992) (citations omitted).

[6]**McCallum v. Rosen's Diversified, Inc.**, 153 F.3d 701,703 (8th Cir. 1998) (*quoting* **Farr v. Farm Bureau Ins. Co.**, 61 F.3d 677, 679 (8th Cir. 1995)).

for such guidance on the issues presented herein presents a challenge. We therefore must resolve the questions posed by evaluating the available Nevada case law addressing similar factual scenarios and by looking to other jurisdictions when necessary.

Nearly every state statutorily permits holders of a certain percentage of corporate shares to petition the courts for dissolution under particular enumerated circumstances. Thirty-six states[7] list the oppression of minority shareholders by controlling shareholders as grounds for dissolution.[8] Nevada does not.[9] Hollis, however, has not

---

[7]**See** F. HODGE O'NEAL & ROBERT B. THOMPSON, O'NEAL'S OPPRESSION OF MINORITY SHAREHOLDERS § 7:13 (2d ed. 1985).

[8]Definitions of "oppression" in this context have tended to take one of three forms. A number of courts have defined oppression in terms of the fairness of the action taken by the majority, using phrases such as "burdensome, harsh and wrongful conduct ... 'a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a corporation is entitled to rely.'" **Id**. at § 7:13, 79-80 (*quoting* **Skierka v. Skierka Bros., Inc.**, 629 P.2d 214, 221 (Mont. 1981)). Other courts have made reference to the fiduciary duties existing between majority and minority shareholders, while still others have found oppression based on the disappointment of the minority's reasonable expectations. O'NEAL & THOMPSON at 80.

[9]The Nevada dissolution statute allows for dissolution and the appointment of a receiver upon application of the holders of one-tenth of the company's stock whenever:

(a)     The corporation has willfully violated its charter;
(b) Its trustees or directors have been guilty of fraud or collusion or gross mismanagement in the conduct or control of its affairs;
(c)     Its trustees or directors have been guilty of misfeasance, malfeasance or nonfeasance;
(d) The corporation is unable to conduct the business or conserve its assets by reason of the act, neglect or refusal to function of any of the directors or trustees;
(e)     The assets of the corporation are in danger of waste, sacrifice or loss through attachment, foreclosure, litigation or otherwise;
(f)     The corporation has abandoned its business;
(g) The corporation has not proceeded diligently to wind up its affairs, or to distribute its assets

sought dissolution of FFUSA under NEV. REV. STAT. § 78.650. Instead, he contended, and the district court found, that Hill's actions amount to a breach of fiduciary duty owed him and that equitable relief is therefore available.[10] Before us, then, is the question whether a duty of loyalty was breached by Hill and, if so, whether the district court erred in granting a retroactive buy-out remedy.

## A.  Existence of a Fiduciary Duty

We find that a fiduciary duty existed between Hollis and Hill. The facts reveal that they agreed to begin a business together, incorporating it under the name FFUSA. They retained equal ownership in the corporation, and became officers and directors, agreeing to the work obligations and salary of the other. With only two shareholders and management responsibilities divided between them, a fiduciary relationship was created not unlike that in a partnership.

We find this case analogous to **Clark v. Lubritz**[11] where five doctors agreed to join their practices to form a preferred provider organization called Nevada Preferred

_____

> in a reasonable time;
> (h) The corporation has become insolvent;
> (i)     The corporation, although not insolvent, is for any cause not able to pay its debts or other obligations as they mature; or
> (j)     The corporation is not about to resume its business with safety to the public.

NEV. REV. STAT. § 78.650 (1999).

[10]**Duncan v. Lichtenberger**, 671 S.W.2d 948 (Tex. App. Ct. 1984).

[11]944 P.2d 861 (Nev. 1997).

Professionals (NPP).  They agreed orally that each would contribute $15,000, and that they would share profits and losses equally.  Soon after the agreement, they decided to incorporate.[12]  After a dispute over NPP's benefit plan sales, Lubritz resigned as president and director, intending to relegate himself to "just being a stockholder."[13] Over the next four years, he continued to perform limited services for NPP and continued to receive an equal share of the firm's proceeds.  In the fifth year, however, the other doctors voted, unbeknownst to Lubritz, to reduce the portion of proceeds distributed to Lubritz while increasing their distributions.  When Lubritz learned that he was receiving a lesser share of the firm's profits, he sued.  The court found for Lubritz, both on a breach of contract theory, based on the doctors' original oral agreement, and for breach of fiduciary duty, based on the four shareholders' concealment of the unequal distribution of profits.[14]

In **Clark**, despite the incorporation of NPP, the court imposed fiduciary duties between the shareholders akin to that of a partnership.  The evidence revealed that the

---

[12]It is unclear from the opinion whether the doctors elected to incorporate as a statutory close corporation under NEV. REV. STAT. § 78A.020.  Nevada, not unlike many other states, allows corporations held by fewer than thirty persons to select a set of special governance rules.  It matters not in our analysis of this case, however, because these rules do not alter the fiduciary duties running between corporate participants.

[13]**Clark**, 944 P.2d at 863.

[14]**Id.** at 864-65.

doctors continued to treat each other as partners; no actual stock was issued, no annual shareholder meetings were held, officers and directors were not actually elected, and the bylaws were not used in operating NPP.[15] In the case at bar only two shareholders existed, and there appear to have been no shareholder meetings, election of directors, or adherence to by-laws. Thus, the analogy to a partnership seems perhaps even stronger here, and we see no reason why the Nevada Supreme Court would not treat the agreement between Hollis and Hill in the same manner as the agreement in **Clark**.[16]

We find our decision buttressed by the legal authority dealing with close corporations.[17] We concede that many of Hill's alleged "oppressive" acts, including the diminution and eventual termination of salary, the failure to deliver financial information, the closing of one of the company's offices, termination of employment,

---

[15]**Id.** at 863.

[16]We note that both parties argue over the relevance of Hollis' status as an "equal" rather than "minority" shareholder. We find this distinction immaterial to the present dispute. While we acknowledge that in **Clark** the plaintiff truly was a "minority" shareholder, in the sense that he owned only 1/5 of the stock, we find this difference insignificant in light of Hill's virtually unfettered control of FFUSA. Further, the court in **Clark** never spoke of "minority" shareholder status, partially because it treated the organization as a de facto partnership, but also because the partners who decreased his salary clearly controlled the organization, much like Hill controlled FFUSA in the case at bar. Furthermore, other jurisdictions have agreed that the question of minority versus majority should not focus on mechanical mathematical calculations, but instead, "The question is whether they have the power to work their will on others—and whether they have done so improperly." **Bonavita v. Corbo**, 692 A.2d 119, 123 (N.J. Super. Ct. Ch. Div. 1996). **See also**, *infra* note 20.

[17]FFUSA was not incorporated as a close corporation, but, as observed in footnote 12, this does not affect our analysis in the instant action. Relevant references herein to "close corporation" also mean "closely held" corporation.

11

and the cessation of benefits, are classic examples of acts typically shielded from judicial scrutiny under the business judgment rule. Generally, employees who are adversely affected by such officer and director decisions may not claim oppression by those in control of the corporation, even if they are also shareholders of the corporation.[18] Certain actions by a director, however, receive much different treatment when the corporation only has a few shareholders, including that director.

In the context of a closely held corporation, many classic business judgment decisions can also have a substantial and adverse affect on the "minority's" interest as shareholder. Close corporations present unique opportunities for abuse because the expectations of shareholders in closely held corporations[19] are usually different from those of shareholders in public corporations. As a leading commentator has noted:

> Unlike the typical shareholder in a publicly held corporation, who may be simply an investor or a speculator and does not desire to assume the responsibilities of management, the shareholder in a close corporation considers himself or herself as a co-owner of the business and wants the privileges and powers that go with ownership. Employment by the corporation is often the shareholder's principal or sole source of income.

---

[18]As one court has observed, "a 'fiduciary' duty to every baggage handler at United Airlines just because the employee owns a share of stock would put employee-owned firms at such a competitive disadvantage that they would soon collapse." **Nagy v. Riblet Products Corp.**, 79 F.3d 572, 577 (7th Cir. 1996).

[19]Closely held corporations are characterized by a small number of stockholders, the absence of a ready market for the corporate stock, and substantial majority stockholder participation in the management, direction, and operation of the company. **Donahue v. Rodd Electrotype Co.**, 328 N.E.2d 505 (Mass. 1975).

> Providing employment may have been the principal reason why the shareholder participated in organizing the corporation. Even if shareholders in a close corporation anticipate an ultimate profit from the sale of shares, they usually expect (or perhaps should expect) to receive an immediate return in the form of salaries as officers or employees of the corporation, rather than in the form of dividends on their stock. Earnings of a close corporation are distributed in major part in salaries, bonuses and retirement benefits. . . .[20]

In this setting, it is not difficult for a controlling stockholder to frustrate such expectations and deny a return on investment through means that would otherwise be legitimate.[21]

For this reason, a number of jurisdictions, including Massachusetts in the landmark case **Donahue v. Rodd Electrotype Co.,**[22] have held that the duty existing between controlling and minority shareholders in close corporations is the same as the duty existing between partners.[23] In **Donahue**, the court required a majority

---

[20]F. HODGE O'NEAL & ROBERT B. THOMPSON, 1 O'NEAL'S CLOSE CORPORATIONS § 1:08, at 31-32 (3d ed. 1998).

[21]It is not critical that Hill and Hollis each owned 50% of FFUSA and therefore neither was a majority shareholder. A fiduciary duty exists between shareholders by virtue of the fact that one of the shareholders has control over the corporation's assets. Indeed, a duty has been found to run from the minority to the majority where the minority shareholder had veto power over corporate action. **Smith v. Atlantic Properties, Inc.**, 422 N.E.2d 798 (Mass. App. Ct. 1981). Hill acknowledges that he had control over FFUSA.

[22]328 N.E.2d 505 (Mass. 1975).

[23]The Massachusetts court borrowed this oft-quoted statement from then-Chief Judge Cardozo:

Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. . . . Not honesty alone, but the

shareholder, whose shares were purchased by the corporation, to make available to the minority an equal opportunity to sell a ratable number of shares to the corporation at an identical price.  While **Donahue**'s equal opportunity principle has been rejected by some courts,[24] its recognition of special rules of fiduciary duty applicable to close corporations has gained widespread acceptance.[25]

We find that because FFUSA bore all the traditional characteristics of a close corporation, although not formally incorporated as such, the reasoning behind placing a fiduciary duty on controlling shareholders applies to these facts.  Both Hill and Hollis began the organization in order to participate personally in its management, and made money principally through salaries as officers.  There is no evidence  that either received large dividends or sought to benefit from the sale of his interest.  We thus find close corporation jurisprudence an equally persuasive basis for imposing a fiduciary duty on Hill and for finding that he breached that duty.  Further, as noted above, in **Clark** the Nevada Supreme Court applied to the doctor shareholders the fiduciary duty

---

punctilio of an honor the most sensitive, is then the standard of behavior.

**Id.** at 516 (*quoting*  **Meinhard v. Salmon**, 164 N.E. 545 (N.Y. 1928)).

[24]**Nixon v. Blackwell**, 626 A.2d 1366 (Del. 1993); **Toner v. Baltimore Envelope Co.**, 498 A.2d 642 (Md. 1985); **Delahoussaye v. Newhard**, 785 S.W.2d 609 (Mo. Ct. App. 1990).

[25]**See** F. HODGE O'NEAL & ROBERT B. THOMPSON, 2 O'NEAL'S CLOSE CORPORATIONS § 8:15, at 89 (3d ed. 1998).

applicable to partners rather than the duty of loyalty that applies to corporate actors. Whether couched in terms of a *de facto* partnership or a close corporation, **Clark** provides a strong indication that the Nevada Supreme Court would find fiduciary obligations between shareholders in a corporation such as FFUSA operated by shareholder-directors.

Hill's contentions that no such duty existed in the present case are not persuasive. That Nevada does not list oppression among its bases for statutory dissolution under NEV. REV. STAT. § 78.650 does not preclude the existence of a fiduciary duty. The dissolution statutes do not provide the exclusive remedies for oppressed shareholders; courts have equitable powers to fashion appropriate remedies where the majority shareholders have breached their fiduciary duty to the minority by engaging in oppressive conduct.[26] In addition, a number of states have found breaches of fiduciary duty on bases which would not support dissolution under their statutes.[27]

---

[26]**Masinter v. Webco**, 262 S.E.2d 433 (W.Va. 1980); **Alaska Plastics, Inc. v. Coppock**, 621 P.2d 270 (Alaska 1980).

[27]*Compare* MASS. GEN. LAWS Ch. 156 B, § 99 (allowing only deadlock as grounds for dissolution), *with* **Zimmerman v. Bogoff**, 524 N.E.2d 849 (Mass. 1988) (finding breach of fiduciary duty based on 50% shareholder's failure to pay debts owed to another business held by other 50% shareholder); ME. REV. STAT. ANN. tit.13-A, § 1115 (West 1999) (allowing dissolution only upon showing of deadlock, fraud, illegality, waste, that the corporation has abandoned its business, or the existence of a provision in the articles of incorporation permitting dissolution under the circumstances), *with* **Rosenthal v. Rosenthal**, 543 A.2d 348 (Me. 1988) (recognizing fiduciary duty might exist where plaintiff alleged he was forced out of the family businesses in bad faith and that he sold his share of those businesses at an unfairly low price); OHIO REV. CODE ANN. § 1701.91 (Anderson 2000) (allowing involuntary dissolution for deadlock only), *with* **Crosby v. Beam**, 548

We likewise decline Hill's invitation to apply the law of Delaware. While mindful of the cases cited by Hill where courts applying Nevada law have looked to Delaware on unrelated issues of corporate law, we conclude that cases such as **Clark** remain a better indication of the Nevada court's position with respect to issues involving close and closely held corporations. The opinions of the Delaware courts are often influential in matters of corporate law, but no more so in Nevada than any of the other states that have followed **Donahue**.[28]

Nor do we accept Hill's suggestion that our analysis should reflect Nevada's

---

N.E.2d 217 (Ohio 1989) (allowing direct shareholder action for damages based on breach of fiduciary duty); GA. CODE ANN. § 14-2-940 (1999) (allowing dissolution of corporations which have not elected to become statutory close corporations only upon showing of deadlock likely to result in irreparable harm, fraud, illegality, or waste), *with* **Thomas v. Dickson**, 301 S.E.2d 49 (Ga. 1983) (affirming minority shareholder's right to bring direct action for improper squeeze out).

[28]In addition, as at least one commentator has noted, it is unclear how the Delaware courts might decide a case involving a "classic freeze out" such as this one. Robert A. Ragazzo, *Toward a Delaware Common Law of Closely Held Corporations*, 77 Wash. U.L.Q. 1099 (1999). While it is true that some of the Delaware opinions, most notably **Nixon v. Blackwell**, 626 A.2d 1366 (Del. 1993), contain very forceful dicta indicating that Delaware is likely not to apply heightened fiduciary duties to participants in close corporations, the Delaware Supreme Court has yet to consider the precise issue in this case, namely whether a controlling shareholder is liable for actions taken with the purpose and effect of freezing out another shareholder. In **Riblet Products Corp. v. Nagy**, 683 A.2d 37 (Del. 1996), the Delaware Supreme Court decided, upon certified question from the Seventh Circuit, that majority stockholders are not liable for violation of a fiduciary duty to an employee under contract for issues involving that employment. Though observing that Delaware has not chosen to follow **Wilkes v. Springside Nursing Home, Inc.**, 353 N.E.2d 657 (Mass. 1976), discussed *infra*, the court also indicated that it might have decided the case differently if Nagy had alleged that his termination amounted to a wrongful freeze out of his stock interest.

16

desire to provide management-friendly corporate law.[29]  If indeed that is Nevada's desire, it would not necessarily be furthered in the context of the close or closely held corporation where disputes typically pit manager/shareholder against manager/shareholder.[30]

## B.      Breach of Fiduciary Duty

Convinced of the existence of a fiduciary duty between shareholders in a close corporation, we turn to the scope of that duty and examine whether Hill breached his duty in the case at bar.  As previously noted, the scope of this fiduciary duty has varied among the jurisdictions which have adopted **Donahue**.  One context in which the scope has been frequently litigated has been with regard to salary and employment decisions. Again, Nevada has not addressed this issue and we must look to the law of other jurisdictions for guidance.

In another landmark Massachusetts case, **Wilkes v. Springside Nursing Home,**

---

[29]For this proposition, Hill cites Keith P. Bishop, *The Delaware of the West: Does Nevada Offer Better Treatment for Directors?*, 7 No. 3  INSIGHTS 20 (1993).

[30]Both parties spoke at length during oral argument about the effect of **Smith v. Gray**, 250 P. 369 (Nev. 1926).  We find that **Smith** provides little guidance on the issue presented today.  While the court noted that minority shareholders generally may bring a case in equity to challenge oppressive conduct by majority shareholders, the case not only proves so dated as to be questionable authority at best with respect to the current court's position, it involved a business incorporated in Arizona, not Nevada.

17

**Inc.**,[31] four associates formed a corporation in 1951 for the purpose of operating a nursing home. Each paid in $100 with the understanding that each of them would be a director and would participate in the management of the corporation. The corporation paid no dividends, but by 1955 each was receiving $100 per week as salary. When relations became strained between Wilkes and one of the other investors, Wilkes declared his intention to sell his shares. The other three board members met, eliminated Wilkes' salary, declined to reelect him as director, and terminated his employment with the corporation.

The Massachusetts court reiterated that, under **Donahue**, shareholders in close corporations owe each other a duty of utmost good faith and loyalty. It curtailed **Donahue**'s equal opportunity rule by holding that the duty was not breached if the majority acted pursuant to a legitimate business purpose. In order to avoid hampering management's effectiveness in operating the corporation, the court reasoned, such a rule was necessary in order to preserve management's discretion in declaring dividends, negotiating mergers, establishing the salaries of officers, dismissing directors, and hiring and firing of employees. The court also held that when a legitimate business purpose exists, the minority shareholder must be given an opportunity to demonstrate that the purpose could have been achieved through means less disruptive to its

---

[31]353 N.E.2d 657 (Mass. 1976).

shareholder interests. The court found that the majority shareholders of Springside lacked a legitimate business purpose for ousting Wilkes, and found that the duty they owed Wilkes had been breached for several reasons. The company had a longstanding policy that each investor would be a director in the corporation and that employment would go hand-in-hand with stock ownership. Wilkes was one of the company's four founders and had invested time and capital with the expectation that he would continue to participate in its management. Perhaps most importantly, eliminating Wilkes' salary, in combination with the fact that the corporation never declared a dividend, guaranteed that he would not obtain a return on his investment. These facts led the court to infer a design to pressure Wilkes to sell his shares at a price below their value.

That a controlling shareholder cannot, consistent with his fiduciary duty, effectively deprive a minority shareholder of his interest as a shareholder by terminating the latter's employment or salary has been widely accepted. The states considering the issue directly essentially have adopted the approach of **Wilkes**.[32] In addition, shareholder oppression under the dissolution statutes, which is often defined in the same terms as the fiduciary duty between shareholders, frequently has been found

---

[32]**Nelson v. Martin**, 958 S.W.2d 643 (Tenn. 1997); **Wrightsel v. Ross-Co Redi-Mix, Inc.**, No. 1791, 1993 WL 97780 (Ohio Ct. App. Mar. 26, 1993); **W & W Equip. Co., Inc., v. Mink**, 568 N.E.2d 564 (Ind. Ct. App. 1991); **Duncan v. Lichtenberger**, 671 S.W.2d 948 (Tex. Ct. App. 1984); **Masinter v. Webco Co.**, 262 S.E.2d 433 (W.Va. 1980).

under circumstances similar to those described in **Wilkes**.[33] The opinions make clear, however, that shareholders do not enjoy fiduciary-rooted entitlements to their jobs.[34] Such a result would clearly interfere with the doctrine of employment-at-will.[35] Rather, the courts have limited relief to instances in which the shareholder has been harmed as a shareholder.[36] The fiduciary duty in the close corporation context, as in the context of public corporations, appropriately is viewed as a protection of the shareholder's investment. The precise nature of an investment in a close corporation often is not clear, particularly when the shareholder is also an employee. It is therefore important to distinguish investors who obtain their return on investment through benefits provided to them as employees from employees who happen also to be investors. To that end, courts may consider the following non-exclusive factors: whether the corporation

---

[33]F. HODGE O'NEAL & ROBERT B. THOMPSON, O'NEAL'S OPPRESSION OF MINORITY SHAREHOLDERS § 7:13, at 81 (2d ed. 1985). **See, e.g., Notzke v. Art Gallery, Inc.**, 405 N.E.2d 839 (Ill. App. Ct. 1980); **Exadaktilos v. Cinnaminson Realty Co.**, 400 A.2d 554 (N.J. Super. Ct. Law Div. 1979).

[34]**See, e.g., Ingle v. Glamore Motor Sales, Inc.**, 535 N.E.2d 1311 (N.Y. 1989) (holding that a minority shareholder in a close corporation did not have a fiduciary-rooted exception against at-will discharge where the corporation repurchased his shares pursuant to a repurchase-upon-termination-of-employment clause in a shareholders' agreement); **Gallagher v. Lambert**, 549 N.E.2d 136 (N.Y. 1989) (same). Neither Gallagher nor Ingle was deprived of a return on his investment because in both cases the company repurchased shares at a previously agreed upon price.

[35]**See** Douglas K. Moll, *Shareholder Oppression v. Employment at Will in the Close Corporation: The Investment Model Solution*, 1999 U. Ill. L. Rev. 517. Nevada follows the employment-at-will rule. **Hansen v. Harrah's**, 675 P.2d 394 (Nev. 1984).

[36]**Merola v. Exergen Corp.** 668 N.E.2d 351 (Mass. 1996); **Riblet Products Corp. v. Nagy**, 683 A.2d 37 (Del. 1996).

typically distributes its profits in the form of salaries; whether the shareholder/employee owns a significant percentage of the firm's shares; whether the shareholder/employee is a founder of the business; whether the shares were received as compensation for services; whether the shareholder/employee expects the value of the shares to increase; whether the shareholder/employee has made a significant capital contribution; whether the shareholder/employee has otherwise demonstrated a reasonable expectation that the returns from the investment will be obtained through continued employment; and whether stock ownership is a requirement of employment. The minority's shareholder interest is not injured, however, if the corporation redeems shares at a fair price or a price determined by prior contract or the shareholder is otherwise able to obtain a fair price.

Overlaying these factors to the relevant facts at bar, we conclude that Hollis demonstrated an injury as a shareholder. He was a founder and 50% shareholder of FFUSA. His positions as vice president and director clearly resulted therefrom. He had no reason to expect he would be able to sell his FFUSA shares for a higher price, meaning that the value of his investment was tied directly to his employment. The benefits he received from his investment were distributed in the form of salary and certain perquisites; the firm never declared a dividend and paid no salary to its directors. Hill totally deprived Hollis of those benefits by terminating his employment

and salary, closing the Florida office, and cutting him off from company benefits. As a result, Hollis' shares in FFUSA were rendered worthless. No offer was made by the corporation to purchase Hollis' shares at a fair price upon termination, and Hollis did not have the option of selling his shares to another buyer.

## C.    Remedy

The district court found Hill liable for breach of his fiduciary duty and ordered a buy-out of Hollis's shares. The court determined that Hill began his oppressive conduct on February 28, 1998, and thus ordered the buy-out as of that date, calculating the value of the shares at $667,950. While we essentially agree with the district court's remedial approach, we conclude that its decision to backdate the buy-out to February 28 is clear error.

We again look to Nevada law, particularly **Hines v. Plante**, to determine the remedies available herein. In **Hines**, the Nevada Supreme Court found that the statutory language only identified an appointment of a receiver as a remedy for shareholder actions; however, the court recognized that, "The appointment of a receiver pendente lite is a harsh and extreme remedy which should be used sparingly and only when the securing of ultimate justice requires it. A corollary of this rule is that if the desired outcome may be achieved by some method other than appointing a receiver,

then this course should be followed."[37] This is the same reasoning that other courts have used to allow court ordered buy-outs even in the absence of specific statutory authority.[38] We cannot say, under the circumstances of this case, that the district court's decision to allow such a remedy was clearly erroneous.

We do disagree, however, with the trial court's decision to use February 1998 as the valuation date for the buy-out. Although Hollis' relationship with Hill began to decline significantly in February 1998, many of the actions upon which we base our finding of oppression occurred after this date. Hollis continued to receive his agreed upon salary until September of 1998, when it was reduced by 50%. His salary was not reduced to zero until October of 1998. Hill's unilateral decision to close the Florida office, discontinue the car lease payments, and terminate phone service was not communicated to Hollis until November of 1998. Hollis' original complaint was filed in the district court in December of 1998. As an equal shareholder, Hill commanded as much authority to assert control over the corporation as did Hollis. His failure to act on this authority until December of 1998 was his choice. The presumptive valuation date for other states allowing buy-out remedies is the date of filing unless exceptional

---

[37]**Hines v. Plante**, 661 P.2d 880, 881-82 (Nev. 1983) (internal citations omitted).

[38]**See, e.g., Alaska Plastics, Inc. v. Coppock**, 621 P.2d 270 (Alaska 1980); **Maddox v. Norman**, 669 P.2d 230 (Mont. 1983); **Delaney v. Georgia-Pacific Corp.**, 564 P.2d 277 (Or. 1977); and **Davis v. Sheerin**, 754 S.W.2d 375 (Tex. Ct. App. 1988).

23

circumstances exist which require an earlier or later date to be chosen.[39] No such circumstances exist in this case. Therefore, we conclude that the date of valuation for the court ordered buy-out should be the date suit was filed herein. Use of this date will take into consideration all of Hill and Hollis' actions, inactions, and prudent and imprudent business decisions which affected the value of the business during the intervening period.

We therefore VACATE the calculation of the value of Hollis' shares by the district court and REMAND for further proceedings to determine the proper valuation of Hollis' shares consistent herewith. We likewise VACATE the award of attorney's fees and the fees of expert witnesses, and REMAND for reconsideration of those settings in light of relevant Nevada law.[40] In all other respects, the decision appealed is AFFIRMED.

---

[39]**See Musto v. Vidas**, 754 A.2d 586 (N.J. Super. Ct. App. Div. 2000); **Waller v. American Intern. Distrib. Corp.**, 706 A.2d 460 (Vt. 1997).

[40]**Exxon Corp. v. Burglin**, 4 F.3d 1294, 1302 (5th Cir. 1993) ("The award of attorney's fees is governed by the law of the state whose substantive law is applied to the underlying claims."); Nev. Rev. Stat. § 18.010 (1999); Nev. Rev. Stat. §§ 18.020, 18.005 (1999).

E. GRADY JOLLY, Circuit Judge, dissenting:

Because I find that the cause of action and remedy here would not be adopted by Nevada courts, I respectfully dissent.

The question that needs to be answered in this case, whether framed as a breach of fiduciary duty or a statutory right, is whether Nevada recognizes a cause of action for oppression of minority shareholders. I find no basis to conclude that it does. The Nevada dissolution statute, Nev. Rev. Stat. § 78.650, sets out a statutory basis for the remedy effectively imposed here, and the statute does not allow dissolution for the oppression of minority stockholders. The Nevada case cited to justify the extension of fiduciary duty to cover shareholder oppression, Clark v. Lubritz, 944 P.2d 861 (Nev. 1997), treated the business as a partnership because the parties treated the corporation as a partnership. To follow Clark here, where there is nothing in the past history or present arrangement indicating that the parties have

treated the business as anything other than a corporation, effectively finds that Nevada will ignore corporate structure, when, on a case-by-case basis, equity justifies it.

Furthermore, all indications are that Nevada attempts to pattern its corporate law after the management-friendly approach of Delaware,[41] a state that clearly prohibits a cause of action for oppression of minority shareholders. See Nixon v. Blackwell, 626 A.2d 1366, 1380-81 (Del. 1993) (finding that majority shareholders owe no special fiduciary duties to minority shareholders); F. Hodge O'Neal & Robert B. Thompson, O'Neal's Oppression of Minority Shareholders § 7.13 (2d ed. 1985). Even if

---

[41] See Keith Paul Bishop, Battle for Control of ITT Corporation Spotlights Nevada (and Delaware) Corporate Law: Did Nevada Law Get Stockholders a Better Deal?, 12 Insights, January 1998, at 15 ("Nevada has worked hard to challenge Delaware's pre-eminence as the domicile of choice for corporations."); Keith Paul Bishop, The Delaware of the West: Does Nevada Offer Better Treatment for Directors?, 7 Insights, March 1993, at 20 ("Delaware faces aggressive competition for new corporations from the state of Nevada which aims at being the 'Delaware of the West.'"); Michael J. Sullivan, Extensive Changes Made to Nevada Corporation Law Enacted, 6 Insights, January 1992, at 27 (describing management-friendly changes made to corporate law, and comparing Nevada law to Delaware law).

Nevada is not as friendly to corporate structures and management as Delaware, there is no basis to find that Nevada would adopt the law of Massachusetts, which seems to be at the other end of the spectrum respecting corporate formalities.  In sum, I am convinced that, given the general acknowledgment that Nevada is corporate friendly, as shown through its statutory dissolution provision and its tendency to follow Delaware law, the cause of action and remedy here would not be recognized. I therefore respectfully dissent.