IRVING, P.J.,
for the Court:
¶ 1. On February 24, 2000, E. Harold Knight (Harold) filed a complaint in the Jackson County Chancery Court against Benny R. Knight and Knights’ Piping Inc. (KPI). Harold’s complaint requested a judicial dissolution of KPI, an appoint *454 ment of a receiver/custodian for KPI, and a partition of certain real property. On February 9, 2001, Benny answered the complaint and filed a counterclaim against Harold; Harold’s sons, David Earl Knight, Brian K. Knight, and Raymond K. Knight (Randy); and Knight’s Marine and Industrial Services Inc. (KMIS). Benny’s counterclaim alleged (1) fraud and misrepresentation, (2) usurpation of corporate opportunities, (3) breach of fiduciary duty, (4) conspiracy, (5) negligence, and (6) theft of confidential/proprietary information.
¶ 2. At trial, the chancery court dismissed counts 1-5 of Benny’s counterclaim. Benny moved for the court to dismiss count 6, which the court granted. Ultimately, the chancery court found Benny personally liable for the breach of Harold’s employment contract and awarded Harold damages totaling $1,751,457. Additionally, the court awarded Harold punitive damages of $25,000 and Harold’s sons attorneys’ fees of $43,910.23.
¶ 3. Feeling aggrieved, Benny and KPI appeal and argue that the chancery court: (1) lacked jurisdiction; (2) abused its discretion in interrogating witnesses; (3) erred in deeming Benny’s alleged non-responsive answers admitted; (4) erred in dismissing Benny’s counterclaims; (5) erred in finding that Benny terminated Harold on September 3, 1999; (6) erred in holding Benny personally liable for the breach of Harold’s employment contract; (7) erred in its determination of damages related to the breach of Harold’s employment contract; (8) erred in awarding punitive damages; and (9) erred in awarding attorneys’ fees.
¶ 4. Because the chancery court erred in awarding attorneys’ fees to Harold’s sons and in awarding Harold certain damages that were not contemplated by his employment contract, we reverse and render the court’s judgment in part. Additionally, we reverse the chancery court’s award of accrued sick leave to Harold, and remand for additional findings regarding the amount of accrued sick leave owed to Harold as of his termination date. As to the remaining issues, we affirm.
FACTS
¶ 5. Benny and Harold are brothers. On August 9, 1977, they formed KPI, a pipe fabrication and installation company. Benny served as president, and Harold served as vice president. The ownership of the company was initially split with Benny holding 51% of the outstanding shares of stock and Harold holding the remaining 49%. In 1989, Benny shot his ex-wife, Brenda Knight. Soon after, Benny was indicted for aggravated assault. Benny stepped down as president, and Harold assumed the role. Harold also became the majority shareholder with a 51% ownership interest; Benny held the remaining 49% interest.
¶ 6. On August 1, 1989, Harold executed an employment agreement with KPI. Under the terms of the contract, if Harold was terminated without just cause, he would be entitled to the following damages: (1) severance pay, (2) a paid whole life insurance policy, (3) a $25,000 contribution to his retirement plan for a period of five years, (4) title to his company vehicle, (5) paid health-insurance benefits for a period of five years, (6) cancellation of any indebtedness owed by Harold to KPI, (7) purchase of his stock at a price of at least $325 per share, (8) payment of accrued vacation time, and (9) payment of accrued sick leave up to 180 days.
¶ 7. Benny had little involvement with KPI in the eighteen months following his indictment. However, once the criminal charges were dropped, Benny returned to KPI. Harold and Benny agreed to restore *455 Benny’s majority ownership interest in KPI. As such, Benny once again held 51% of the outstanding shares, and Harold held 49%.
¶ 8. On March 24, 1999, David filed articles of incorporation for Knights’ Marine and Industrial Services Inc. (KMIS). KMIS’s board of directors consisted of Brian, David, and Randy. The Board elected Brian as president and David as •vice president. Brian and David shared the ownership interest in KMIS 50/50, with each receiving one-half of the 1,000 shares of the common stock issued.
¶ 9. On August 81, 1999, David and Brian approached Benny about buying his interest in KPI. According to Benny, David and Brian offered to purchase his interest for $100,000. When he refused, a fight ensued between David, Brian, and Benny.
¶ 10. According to Harold, when he reported to work on September 3, 1999, Benny fired him. Benny also fired David, Brian, and Randy. While Benny does not dispute that Harold’s sons were fired on September 3,1999, he contends that he did not fire Harold that day. Instead, Benny contends that Harold was fired on December 12, 1999, at a special meeting of KPI’s Board of Directors. During the meeting, the board voted to replace Harold as president, terminate all benefits being paid to him, and require that all company property in Harold’s possession be returned to the company.[1] The meeting minutes do not list a reason for Harold’s termination. However, Benny testified that Harold never returned to work after September 3, 1999, and was terminated based on his prolonged absence from KPI.
¶ 11. On November 2, 1999, Benny and his current wife, Amy McDaniel Knight, were indicted for false pretense, mail/wire fraud, and insurance fraud. Ultimately, Benny entered into a plea agreement which required KPI to plead guilty to one count of criminal information and pay fines and restitution totaling $1,235,031. In exchange, the State agreed to dismiss the charges against Benny and Amy. In 2003, KPI’s Board approved the terms of the plea agreement and authorized the payment of the fines, restitution, and attorneys’ fees from company funds.
¶ 12. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Jurisdiction

¶ 13. Harold’s complaint sought judicial dissolution of KPI, appointment of a custodian for KPI, and partition of certain real property. However, these equitable claims were not listed in the pretrial order or addressed at trial.[2] Instead, the pretrial order listed Harold’s claims against Benny as follows: (1) breach of fiduciary duty, (2) breach of the duty of loyalty, (3) usurpation of corporate opportunity, (4) fraud and misrepresentation, (5) negligence, (6) breach of contract, and (7) conversion. Benny argues that because Harold’s remaining claims were legal — not equitable — jurisdiction was not proper in chancery court. The Mississippi Supreme Court has previously explained:
It has long been settled in this state, as one of the pre-eminent principles of equity procedure, that the [c]hancery *456 [c]ourt having taken jurisdiction on any one ground of equity, will thereupon proceed in the one suit to a complete adjudication and settlement of every one of all the several disputed questions materially involved in the entire transaction, awarding by a single comprehensive decree all appropriate remedies, legal as well as equitable, although all the other questions involved would otherwise be purely of legal cognizance; and in this state, the rule goes even to the extent that if the ground of equity fail under the proof, the cause may still be retained to a complete final decree on the remaining issues although the latter present legal subjects only and the decree would cover only legal rights and grant none but legal remedies,—that having taken jurisdiction the power of the court to administer full relief is limited by nothing but justice itself.
Derr Plantation, Inc. v. Swarek, 14 So.3d 711, 718 (¶ 16) (Miss.2009) (quoting McClendon v. Miss. State Highway Comm’n, 205 Miss. 71, 78, 38 So.2d 325, 327 (1949)) (emphasis added). Harold’s complaint sought equitable relief; therefore, equitable jurisdiction had attached. Furthermore, although Harold later abandoned his equitable claims against Benny, as evidenced by the pretrial order, he still sought the establishment of a constructive trust—an equitable remedy. As such, the chancery court retained jurisdiction to adjudicate Harold’s legal claims and award legal remedies. This issue is without merit.

2. Court’s Interrogation of Witnesses

¶ 14. Benny asserts that the chancery court erred in its interrogation of witnesses during trial. Under Rule 614(b) of the Mississippi Rules of Evidence, “[t]he court may interrogate witnesses, whether called by itself or by a party.” However, “it is grounds for reversal if the trial judge abuses the authority to call or question a witness by abandoning his impartial position as a judge and assuming an adversarial role.” Powell v. Ayars, 792 So.2d 240, 248 (V 29) (Miss.2001) (citation omitted).
¶ 15. While the chancery court interjected numerous times during the trial, we do not find that the court abused its discretion or abandoned its impartial position. Generally, the court’s questions were intended to clear up confusing testimony or encourage testimony from recalcitrant witnesses, which our supreme court has recognized as appropriate circumstances under which a trial judge may question witnesses. See id. at 248^49 (¶ 30). Additionally, the court gave the attorneys the opportunity to ask further questions of witnesses, if necessary, based on the court’s questions. This issue is without merit.

3. Non-Responsive Answers

¶ 16. Benny argues that the chancery court erred in deeming his alleged non-responsive answers to certain questions as admitted. For example, during cross-examination, the following exchange occurred between Benny and Harold’s attorney:
Q: And, of course, you indicated yesterday that Harold missed 30 days [of work] and so that’s—that’s why you fired him?
A: He also told me—
[THE COURT]: The answer is—for the witness—the witness is being evasive—is that is why he fired him because Harold missed 30 days. That’s the answer. Ask your next question.
Q: When you changed the locks, you denied Harold access to his property, correct?
A: I did not.
*457 Q: Did you give him a key?
A: Couldn’t locate him.
[THE COURT]: The answer is—
[THE WITNESS]: No.
[THE COURT]: — he did not give him a key.
¶ 17. Based on our review of the record, the chancery court admonished several witnesses regarding non-responsive answers — not just Benny. Furthermore, Benny’s answers to the questions he complains about on appeal were evasive. Therefore, the chancery court did not err in presuming that the true answers would be unfavorable to Benny’s position and deeming his non-responsive answers as admissions. This issue is without merit.
A Dismissal of Counterclaims
¶ 18. Benny argues that the chancery court erred in dismissing his counterclaims against Harold’s sons and KMIS. Specifically, Benny argues that the chancery court erred in dismissing his counterclaim for fraud and misrepresentation before he had the opportunity to present evidence to support it.
¶ 19. Benny’s claim for fraud and misrepresentation is based on an incident with Resinol, one of KPI’s customers. Johnny R. Johnson, Resinol’s Director of Purchasing, submitted an affidavit averring that one of the tanks that KPI built for Resinol was poorly constructed. Brian had allegedly overseen the construction of the tank, and when Johnson confronted Brian about the tank’s condition, Brian allegedly blamed Benny for its poor construction. Benny had planned to call Johnson to testify; however, the chancery court dismissed Benny’s claim for fraud and misrepresentation before Johnson testified.
¶20. Following the dismissal of Benny’s claims, the chancery court allowed Johnson to testify. Johnson testified that after he realized the tank was defective, he contacted David to resolve the situation. Johnson testified that David blamed Benny for the defective tank. Additionally, David allegedly told Johnson, “[W]e’re going to have to go out and form us [sic] a company that can produce standard quality products.” Finally, Johnson speculated that the tank was intentionally manufactured in a defective manner; however, he admitted that he did not know if David, Brian, or Randy had intentionally constructed a defective tank in an effort to damage Benny and KPI.
¶21. While Benny claims that Johnson’s testimony supports his claims of fraud and misrepresentation, he admitted at trial that there was nothing in Johnson’s affidavit supporting his claim that David, Brian, or Randy intentionally constructed the defective tank. Furthermore, there was nothing in Johnson’s testimony that supported Benny’s allegation that Harold’s sons intentionally constructed an inferior tank. Therefore, the chancery court did not err in dismissing Benny’s counterclaim for fraud and misrepresentation. This issue is without merit.

5. Termination Date

¶ 22. Benny argues that the chancery court’s finding that he terminated Harold on September 3, 1999, is not supported by substantial evidence. Benny contends that Harold was not terminated until the special board meeting on December 12, 1999. However, based on our review of the record, there was substantial evidence to support the chancery court’s finding that Benny terminated Harold on September 8,1999.
¶ 23. First, Harold testified that when he reported to work on September 3, 1999, KPI employees informed him that Benny had instructed them that they no longer reported to Harold. Benny objects to Ha *458 rold’s testimony because it is hearsay; however, this testimony is not the only evidence that Benny terminated Harold on September 3,1999.
¶ 24. Second, according to a police report, Benny’s son, Ray, contacted the police and requested their presence at KPI on September 3, 1999, “because they were going to fire several people.” Harold testified that the police instructed him, in Benny’s presence, to leave the property. Harold admitted that he never talked to Benny that day and that Benny never told him that he was terminated. Third, Harold testified that he received no salary or benefits following September 3, 1999. Based on the above, there is substantial evidence supporting the chancery court’s conclusion that Benny terminated Harold on September 3, 1999. This issue is without merit.

6. Personal Liability

¶ 25. Benny argues that the chancery court erred in holding him personally liable for damages related to the breach of Harold’s employment contract. KPI was a closely held corporation with Benny and Harold as its only shareholders. When Benny terminated Harold, he was the majority shareholder, and Harold was the minority shareholder. Our supreme court has held that “in a close corporation where a majority stockholder stands to benefit as a controlling stockholder, the majority’s action must be ‘intrinsically fair’ to the minority interest.” Fought v. Morris, 543 So.2d 167, 171 (Miss.1989).
¶ 26. In Fought, the supreme court recognized the “acute vulnerability” of minority shareholders in closely held corporations. Id. at 170. A minority shareholder in a closely held corporation is vulnerable for several reasons:
The majority is able to dictate the manner in which the corporation is run. Shares are not publicly traded so that a fair market for them is seldom available. Dissention makes the minority interest unattractive to a prospective purchaser. Consequently, the minority shareholder can neither profitably leave, nor safely stay with, the corporation. Thus, the only prospective buyer is usually a majority shareholder. Finally, close corporations frequently originate in the context of relationships personal in nature, often undertaken by family members or friends.
Id. at 170-71 (citing Orchard v. Covelli, 590 F.Supp. 1548, 1557 (W.D.Pa.1984)).
¶ 27. The ability of majority shareholders to “squeeze out” or “freeze out” minority shareholders through various tactics also contributes to the minority shareholder’s vulnerability. One particularly effective tactic involves terminating a minority shareholder’s employment. Other jurisdictions have described this tactic as “especially pernicious” given that “[t]he minority stockholder typically depends on his salary as the principal return on his investment, since the ‘earnings of a close corporation are distributed in major part in salaries, bonuses, and retirement benefits.’ ” Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 353 N.E.2d 657, 662 (1976) (quoting F. Hodge O’Neal & Robert B. Thompson, O’Neal’s Close Corporations § 1.07 (1971)). Therefore, “by terminating a minority stockholder’s employment or by severing him from a position as an officer or director, the majority effectively frustrate the minority stockholder’s purposes in entering on the corporate venture and also deny him an equal return on his investment.” Id. at 662-63.
¶ 28. Our supreme court has held that “squeeze-outs” or “freeze-outs” in close corporations “constitute [a] breach of duty *459 or good faith between shareholders.” Bluewater Logistics, LLC v. Williford, 55 So.3d 148, 161 (¶ 52) (Miss.2011) (citing Fought, 543 So.2d at 169). In Bluewater, three members of a limited liability company (LLC) terminated the fourth member and refused to buy out his interest as required under the operating agreement. Id. at 151 (¶ 1). The ousted member sued the LLC and the individual members for breach of contract. Id. at 152, 158 (¶¶ 5, 38). The chancery court found the ousting majority members personally liable for intentional breach of contract based on their refusal to purchase the ousted minority member’s interest in the LLC. Id. at 160 (¶ 49). The supreme court affirmed the chancery court’s judgment, citing its previous holding in Fought. See id. at 161 (¶¶ 51-53). The court explained that the members had a fiduciary duty to each other and to the LLC, and the majority members had breached that duty by squeezing out the minority member. Id. at (¶ 53).
¶ 29. In Hollis v. Hill, 232 F.3d 460, 470-71 (5th Cir.2000), the United States Court of Appeals for the Fifth Circuit noted that it is a widely accepted principle of law “[t]hat a controlling shareholder cannot, consistent with his fiduciary duty, effectively deprive a minority shareholder of his interest as a shareholder by terminating the latter’s employment or salary.” Id. at 470. The court further noted, however, that minority “shareholders do not enjoy fiduciary-rooted entitlements to their jobs [because] [s]uch a result would clearly interfere with the doctrine of employment-at-will.” Id. Therefore, “courts have limited relief to instances in which the [minority] shareholder has been harmed as a shareholder.” Id. at 471. However, a majority shareholder does not breach his fiduciary duty when he terminates a minority shareholder if he has “acted pursuant to a legitimate business purpose.” Id. at 470.
¶ 30. We recognize that there are times when a majority shareholder may terminate a minority shareholder with impunity. Hollis says as much. But this not such a case. Therefore, based on our supreme court’s holdings in Fought and Bluewater, we find that the chancery court did not err in holding Benny personally liable for his intentional breach of Harold’s employment contract.[3] Benny admitted in his testimony that he unilaterally terminated Harold. Harold testified that Benny never gave him a reason for his termination, and Benny has offered no legitimate business purpose for terminating Harold. Furthermore, Benny’s actions effectively guaranteed that Harold would not receive a return on his interest in KPI, as earnings were distributed in the form of salaries and other benefits as opposed to dividends. This issue is without merit.

7. Compensatory Damages

¶ 31. Benny argues that the chancery court erred in its determination of certain damages owed to Harold based on Benny’s breach of Harold’s employment contract. First, Benny argues that Harold is not entitled to payment for 180 days of accrued sick leave where there was no proof regarding whether he had used any sick days. A chancery court’s “findings of fact will not be reversed if supported by *460 substantial evidence.” In re Estate of Smith, 69 So.3d 1, 4 (¶ 10) (Miss.2011) (citing In re Guardianship of Duckett, 991 So.2d 1165, 1173 (¶ 15) (Miss.2008)).
¶ 32. Harold testified that sick leave was “monitored very loosely” by the company’s secretary, but he did not keep track of his sick leave. Harold provided no testimony regarding whether he had used any sick leave. Therefore, the chancery court erred in determining that Harold was entitled to the full 180 days of accrued sick leave as contemplated in his employment contract. Consequently, we reverse the chancery court’s award of $145,360 as payment for 180 days of accrued sick leave and remand this issue to the chancery court for specific findings regarding the amount of accrued sick leave owed to Harold.
¶ 33. Second, Benny argues that the chancery court erred in awarding Harold $100,000 for the value of a forfeited certificate of deposit. In 1999, KPI obtained a line of credit from Hancock Bank. As security for the loan, Benny and Harold each put up certificates of deposit for $100,000. In 2000, KPI fell behind on its payments on the loan, and Hancock Bank applied the two certificates of deposit to the outstanding principal balance.
¶ 34. Harold’s employment contract provides that outstanding loans made by KPI to Harold will be forgiven upon his wrongful termination; however, it is silent as to loans made by Harold to KPI. Because the repayment of shareholder loans is not contemplated in Harold’s employment contract, the chancery court erred in finding that Benny was liable for the loss of Harold’s certificate of deposit. For the same reason, the chancery court erred in awarding Harold $14,278 for an unpaid shareholder loan he made to KPI in 1998.
¶ 35. Finally, Benny argues that the chancery court erred in awarding Harold damages for unpaid rental income on the property that served as KPI’s office. In 1980, Benny and Harold purchased real property in Pascagoula, Mississippi. They later built KPI’s office and a fabrication workshop on the property. In 1989, Harold and Benny entered into a lease agreement with KPI. Under the terms of the lease agreement, KPI agreed to lease the real property and buildings located on the property for $75,300 annually. The lease agreement had a one-year term with an option to extend the lease under the same conditions for two consecutive terms of five years per term.
¶ 36. Harold testified that he received lease payments through 1998, but he received no lease payments after that year even though KPI continued to do business at that location until the company ceased operations in 2002. The chancery court awarded Harold $37,500 in unpaid rent for 1999 and $225,000 for 2000 through 2005.[4] Again, unpaid rent was not contemplated as an element of damages in Harold’s employment contract. Accordingly, the chancery court erred in awarding Harold damages for unpaid rent.
¶ 37. In conclusion, we reverse the chancery court’s award of damages for Harold’s unpaid accrued sick leave and remand for specific findings regarding the amount of sick leave Harold had used, if any. We reverse and render the chancery court’s award of damages for Harold’s loss of his certificate of deposit, his unpaid shareholder loan, and unpaid rent.

8. Attorneys’ Fees

¶ 38. Benny argues that the chancery court erred in awarding David, *461 Brian, Randy, and KMIS attorneys’ fees totaling $43,910.23. The chancery court determined that Benny’s counterclaims against Harold’s sons and KMIS were frivolous and awarded attorneys’ fees pursuant to Rule 11(b) of the Mississippi Rules of Civil Procedure.[5] Benny contends that because his counterclaims survived summary judgment, they could not be deemed frivolous for purposes of Rule 11(b). We agree.
¶ 39. Our supreme court has previously held that a trial judge erred in awarding attorney’s fees under Rule 11(b) where the court “refused to grant the defendant a directed verdict at the close of [the] plaintiffs case.” Nichols v. Munn, 565 So.2d 1132, 1137 (Miss.1990). We see no reason to hold differently in the context of summary judgment. Therefore, the chancery court erred in awarding attorneys’ fees to Harold’s sons and KMIS after it denied their motion for summary judgment with respect to those same claims.

9. Punitive Damages

¶ 40. Benny also complains that the chancery court erred in awarding Harold punitive damages. However, our supreme court has previously held that breach of fiduciary duty by a majority shareholder in a closely held corporation is recognized as an “extreme case” where punitive damages may be award. Fought, 543 So.2d at 173; see also Missala Marine Servs., Inc. v. Odom, 861 So.2d 290, 295 (¶22) (Miss.2003) (holding that punitive damages were appropriate in a case involving corporate freeze out of a minority shareholder). Consequently, the chancery court did not abuse its discretion in awarding punitive damages. This issue is without merit.
¶ 41. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED IN PART, REVERSED AND RENDERED IN PART, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANTS AND ONE-HALF TO THE AP-PELLEES.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. Only Benny and his son, Benny Knight Jr. (Ray), were present at the meeting. Benny moved to terminate Harold's benefits and Ray seconded.

. According to the pretrial order, the pleadings were amended to conform with the order.

. We pause to note that Benny also takes issue with some of the chancery court's factual findings regarding his use of corporate funds, which, in addition to a finding that Benny breached his fiduciary duty owed to Harold as a minority shareholder, supported the court's decision to impose personal liability on Benny. Given our holding that Benny is personally liable based on his breach of his fiduciary duty, we need not address Benny’s challenge to the chancery court’s factual findings regarding his use of corporate funds.

. The property was sold at the beginning of 2006.

. Rule 11(b) provides, in pertinent part:
If any party files a motion or pleading which, in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay, the court may order such a party, or his attorney, or both, to pay to the opposing party or parties the reasonable expenses incurred by such other parties and by their attorneys, including reasonable attorneys’ fees.