## Del Borrello v. Del Borrello

*Gary Perkiss,* for plaintiff.

*Jeffrey Zucker, Lane Fisher* and *Dennis George,* for defendants.

HERRON, *J.,* August 28, 2001—This case is one of the many disturbingly common lawsuits in which family members turn on each other in fighting for control of a close corporation. Defendants Paul Del Borrello, Dennis Leonard, Glen Strafella[1] and United Financial Services Group Inc. have filed preliminary objections to the amended complaint of plaintiff Peter Del Borrello. In addition, Peter has filed a motion to disqualify defendants' counsel from continuing their representation in this matter. For the reasons set forth in this opinion, the court is issuing a contemporaneous order sustaining the objections in part and overruling the objections in part. The court is also ordering that discovery be taken as to the factual disputes raised by the motion to disqualify.

## BACKGROUND

Peter, Paul, Dennis and Glen each own 25 percent of the issued and outstanding shares of United Financial Services Group Inc., a Pennsylvania check-cashing agency and franchisor. Each of the individual defendants is currently a United director and officer, while Peter is a

---

1. Paul, Dennis and Glen are referred to collectively as the "individual defendants."

former United director and officer.[2] According to the complaint, United's shareholders and directors operated according to an informal rule under which no action would be taken unless approved by all shareholders or directors. This rule was neither memorialized in United's bylaws nor required by Pennsylvania law.

The plaintiff alleges that Paul approached Peter in December 1999 and proposed to oust Glen from United. Under this "December plan," Paul, Dennis and Peter would act in concert to force Glen to transfer his United shares to either United or Paul. The complaint asserts that Dennis was conceived of as an alternate target of the December plan but that Paul considered Glen more financially vulnerable. When Peter rejected Paul's overtures, Paul allegedly turned his sights on Peter and secured the cooperation of Glen and Dennis.

According to the complaint, the conflict between Peter and the individual defendants came to a head at the United board meeting on December 19, 2000. Prior to the meeting, all three individual defendants supposedly agreed that they would vote in unison and would refuse to consider any issues or proposals raised by Peter. In addition, the individual defendants allegedly prepared an amendment to the United bylaws to provide that United's vice president, then Peter, would have only the powers and responsibilities delegated by United's chief executive officer, then Paul, and United's board of directors.

---

2. Although the United bylaws did not specify that the corporation had a position of vice president, Peter served as United's vice president from the corporation's formation in 1991.

At the meeting, Peter introduced a resolution that called for establishing an investigative committee to determine whether certain conduct by United officers should have been disclosed to United franchisees.[3] This resolution was rejected by the individual defendants, while the amendment was approved, over Peter's objections. The complaint states that the United board further voted to remove Peter from his position as vice president, although the transcript of the meeting, as attached to the complaint, indicates that Peter resigned his position as vice president. Complaint, exhibit C at 43-44.[4]

The complaint alleges that Peter has continued to dominate the operations of United and that the individual defendants have oppressed Peter in the following ways, both before and after the meeting:

"(1) Excluding Peter from a United board meeting on November 30, 2000 and meetings with United's corporate counsel, as well as numerous other informal meetings;

"(2) Depriving Peter of and preventing Peter from obtaining information regarding United franchisees and vendors and other United financial information;

"(3) Omitting Peter from the circulation of memoranda and newsletters regarding United franchisees;

"(4) Excluding Peter from participation at a trade convention;

---

3. Peter alleges that this conduct could be in violation of Pennsylvania and federal law and could lead to United incurring heavy financial penalties.

4. In addition to the actions described *supra*, Peter asserts that Paul devised a scheme to defraud United franchisees.

"(5) Refusing to approve the establishment of the disclosure committee, thereby endangering Peter's investment in United;

"(6) Excluding Peter from decisions related to personnel, including the hiring of a president and chief operating officer and the discipline and termination of employees; and

"(7) Resisting Peter's efforts to obtain an office within United's new corporate headquarters upon its move."

It is also asserted that Paul and other United employees have sought to intimidate Peter's son, Thomas, a United district manager, causing him anxiety and fear. As a result of these alleged actions, Peter has brought claims for oppression and breach of fiduciary duty and requested the appointment of a custodian for United. In response, the defendants have filed the objections, which assert that the complaint is legally insufficient.[5]

In this opinion, the court also considers the motion to disqualify. This motion is based on Peter's assertion of a prior attorney-client relationship between himself and each of Lane Fisher, Jeffrey Zucker and Fisher Schu-

---

5. The objections also contend that the complaint includes scandalous and impertinent allegations of the individual defendants' behavior that were to have been investigated by the disclosure committee. The court finds certain allegations in the complaint so inappropriate and prejudicial that a discussion of them is unnecessary and orders that these allegations be stricken. See *Commonwealth Department of Environmental Resources v. Hartford Accident & Indemnity Co.,* 40 Pa. Commw. 133, 137-38, 396 A.2d 885, 888 (1979) (a court may strike scandalous and impertinent allegations "when a party can affirmatively show prejudice"). Those allegations regarding conduct toward Tommy, while not actionable, as discussed *infra,* are not sufficiently prejudicial to require that they be stricken.

macher & Zucker LLC, and the conflict of interests arising therefrom.

## DISCUSSION

The allegations that the individual defendants have oppressed Peter by defrauding and failing to disclose certain information to United franchisees are not actionable, and Count I, which is based solely on such allegations, must be dismissed. Because the complaint alleges oppressive conduct in the remaining counts, however, the remaining objections asserting legal insufficiency are without merit and are overruled. The motion to disqualify requires additional factual development before it can be ruled on.

### I. *With the Exception of Count I, the Counts Set Forth in the Complaint Are Legally Sufficient*

The defendants contend that the conduct alleged in the complaint does not qualify as "oppressive" and therefore does not justify the appointment of a receiver or any of the other equitable remedies Peter has requested. While some of the conduct Peter complains of qualifies as "oppressive," the allegations supporting Count I do not qualify as oppression, and that count must be dismissed.

For the purposes of reviewing preliminary objections in the form of a demurrer, "all well-pleaded material, factual averments and all inferences fairly deducible therefrom" are presumed to be true. *Tucker v. Philadelphia Daily News,* 757 A.2d 938, 941-42 (Pa. Super. 2000). When presented with preliminary objections whose end result would be the dismissal of a cause of action, a court

should sustain the objections only where "it is clear and free from doubt from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish [its] right to relief." *Bourke v. Kazaras,* 746 A.2d 642, 643 (Pa. Super. 2000). (citation omitted) Furthermore,

"[I]t is essential that the face of the complaint indicate that its claims may not be sustained and that the law will not permit recovery. If there is any doubt, it should be resolved by the overruling of the demurrer. . . . Put simply, the question presented by demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible." *Bailey v. Storlazzi,* 729 A.2d 1206, 1211 (Pa. Super. 1999).

Under 15 Pa.C.S. §1767, a court may appoint a custodian for a corporation upon application of a shareholder when:

"[I]n the case of a closely held corporation, the directors or those in control of the corporation have acted illegally, oppressively or fraudulently toward one or more holders or owners of 5 percent or more of the outstanding shares of any class of the corporation in their capacities as shareholders, directors, officers or employees." 15 Pa.C.S. §1767(a)(2).[6] Oppressive conduct in the context of a close corporation "often takes the form of freezing-out a minority shareholder by removing him from his various offices or by substantially diminishing

---

6. Because United has only four shareholders, it meets the definition of a "closely held corporation," which is defined as "[a] business corporation that: (1) has not more than 30 shareholders; or (2) is a statutory close corporation." 15 Pa.C.S. §1103.

his power or compensation," although no further description is given. 15 Pa.C.S. §1767 amended comment—1990.

Much ink has been spilt over what exactly constitutes "oppressive conduct." Courts in the United States have used three approaches to determine whether a minority shareholder is being oppressed:

"Some courts describe oppression as 'burdensome, harsh and wrongful conduct . . . a visible departure from the standards of fair dealing and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.' Other courts link the term directly to breach of the fiduciary duty of good faith and fair dealing majority shareholders owe minority shareholders, a duty that many courts recognize as enhanced in a close corporation setting. . . . A third view ties oppression to frustration of the reasonable expectations of the shareholders." Robert B. Thompson, *The Shareholder's Cause of Action for Oppression,* 48 Bus. Law. 699, 711-12 (1993). (footnotes omitted) See also, *Hollis v. Hill,* 232 F.3d 460, 465 n.8 (5th Cir. 2000) (noting that definitions of minority shareholder oppression usually take one of these three forms).

While remarkably few Pennsylvania state cases address or define shareholder oppression, it appears that Pennsylvania has adopted the "reasonable expectations" test to define oppression. In *Gee v. Blue Stone Heights Hunting Club Inc.,* 145 Pa. Commw. 658, 604 A.2d 1141 (1992), the court considered the treatment of a nonprofit corporation's shareholders in a case of first impression. The court relied on a New York Court of Appeals case to

find that "[o]ppressive actions refer to conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise." 145 Pa. Commw. at 665, 604 A.2d at 1145 (quoting *In the Matter of the Judicial Dissolution of Kemp & Beatley Inc.,* 64 N.Y.2d 63, 484 N.Y.S.2d 799, 473 N.E.2d 1173 (1984)).[7]

While *Gee's* adoption of a specific "oppression" test is helpful, it does not speak to oppression in a close corporation context or elaborate on what expectations may

---

7. Several other states have adopted the reasonable expectations test in one form or another. See *e.g., Capital Toyota Inc. v. Gerwin,* 381 So.2d 1038, 1039 (Miss. 1980) (examining plaintiff's reasonable expectations); *Fox v. 7L Bar Ranch Co.,* 645 P.2d 929, 933 (Mont. 1982) ("[b]ecause of the special circumstances underlying closely held corporations, courts must determine the expectations of the shareholders concerning their respective roles in corporate affairs"); *Brenner v. Berkowitz,* 634 A.2d 1019, 1029 (N.J. 1993) ("[c]ourts also should consider whether the misconduct thwarts the minority shareholder's reasonable expectations of his or her role in the corporation"); *Landstrom v. Shaver,* 561 N.W.2d 1, 8 (S.D. 1997) ("oppressive actions to refer to conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise"). Cf. Minn. Stat. §302A.751, subd. 3a (directing courts to take into account "the reasonable expectations of all shareholders" when determining relief for oppression); *Meiselman v. Meiselman,* 307 S.E.2d 551, 563 (N.C. 1983) ("a complaining shareholder's 'rights or interests' in a close corporation include the 'reasonable expectations' the complaining shareholder has in the corporation"); *Kiriakides v. Atlas Food Sys. & Servs.,* 541 S.E.2d 257, 264 (S.C. 2001) (a court may not "order a corporate dissolution *solely* upon the basis that a party's 'reasonable expectations' have been frustrated by majority shareholders," although it may take reasonable expectations into account); *Masinter v. Webco Co.,* 262 S.E.2d 433, 442 (W.Va. 1980) ("[a] claim of a freeze-out rests on the wrongful denial by the majority shareholders of the legitimate claims or expectations of a minority shareholder").

be reasonable and is thus of limited use in the instant matter.[8]

More recently, the Pennsylvania Superior Court looked outside of case law on shareholder oppression[9] and relied on a non-legal dictionary to define "oppression" as "unjust or cruel exercise of authority or power." *Leech v. Leech,* 762 A.2d 718, 720 (Pa. Super. 2000) (quoting Meriam Webster's Collegiate Dictionary (10th ed.1996)). Given this general and non-legal source, however, the definition provided in *Gee* is more apt, even though *Leech* involved a close corporation.[10]

Other than *Gee* and *Leech,* no Pennsylvania cases of any significance address the issue of shareholder oppression, let alone oppression of a minority shareholder of a

---

8. This is not to say that the reasonable expectations test is without detractors in Pennsylvania. See Sandra K. Miller, *Should the Definition of Oppressive Conduct by Majority Shareholders Exclude a Consideration of Ethical Conduct and Business Purpose?* 97 Dick. L. Rev. 227, 263 (1993) (criticizing the reasonable expectations test and urging the adoption of a "hybrid approach" that would examine "whether there has been burdensome, harsh, and wrongful conduct violating standards of fair dealing and fair play on which every shareholder should be entitled to rely in entrusting money to a corporation").

9. *Leech* is remarkable in that it does not cite a single case and focuses, instead, solely on the defendant's actions and the language of section 1767.

10. The court believes firmly that it should follow the guidance set forth in *Gee,* despite criticism that has been leveled against that decision. See Sandra K. Miller, *A Note on the Definition of Oppressive Conduct by Majority Shareholders: How Can the Reasonable Expectations Standard be Reasonably Applied in Pennsylvania,* 12 J.L. & Com. 51, 66 (1992) (arguing that *Gee* "fails to evaluate alternative approaches, and fails to refer to New Jersey's precedents," rendering the decision "somewhat distressing" and "incomplete").

close corporation.[11] This forces the court to look to other states for guidance in defining a close corporation minority shareholder's reasonable expectations.

Numerous courts have remarked on the susceptibility of close corporation minority shareholders to oppression by the majority shareholders. See *e.g., Crosby v. Beam,* 548 N.E.2d 217, 220 (Ohio 1989) (reviewing scenarios involving oppression of close corporation minority shareholders); *Donahue v. Rodd Electrotype Co. of New England Inc.,* 328 N.E.2d 505, 513-15 (Mass. 1975) (reviewing cases and articles on vulnerability of close corporation minority shareholders). See also, William Meade Fletcher, 12B Fletcher Cyclopedia of the Law of Private Corporations §5820.10 ("minority shareholders in close corporations are particularly vulnerable to oppressive conduct"). Of the foreign courts that have considered oppression under these circumstances, the court finds those of New Jersey the most persuasive. First, like Pennsylvania, New Jersey has adopted the reasonable expectations test. See *Brenner v. Berkowitz,* 634 A.2d 1019, 1029 (N.J. 1993) ("[c]ourts also should consider whether the misconduct thwarts the minority shareholder's reasonable expectations of his or her role in the corporation"). In addition, Pennsylvania's section 1767(a)(2) eschews the approach taken in the Statutory Close Corporation Supplement to the Model Business Corporation Act, which disallows relief where a minor-

---

11. Other cases addressing section 1767 and its predecessor are of little value. See Miller, *Note,* 12 J.L. & Com. at 64-65 and 65 n.72 (1992) (discussing, inter alia, *ARC Mfg. Co. Inc. v. Konrad,* 321 Pa. Super. 72, 467 A.2d 1133 (1983), and *O'Malley v. Desmond,* 62 D.&C.2d 645 (C.P. Phila. 1973)).

ity shareholder is oppressed in his or her capacity as an employee, and "follows the New Jersey law . . . in providing relief for non-officer employee shareholders." 15 Pa.C.S. §1767 amended comment—1990. See also, John W. McLamb and Wendy C. Shiba, Pennsylvania Corporation Law & Practice §5.8 ("[t]he New Jersey statute and others like it should be considered in interpreting 1988 BCL §1767(a)(2)"); Sandra K. Miller, *A Note on the Definition of Oppressive Conduct by Majority Shareholders: How Can the Reasonable Expectations Standard be Reasonably Applied in Pennsylvania*, 12 J.L. & Com. 51, 63-64 (1992) (setting forth reasons for relying on New Jersey law to interpret definition of oppressive conduct under section 1767(a)(2)). For these reasons, the court will focus its discussion on cases addressing N.J.S.A. §14A:12-7(1)(c), which serves as New Jersey's equivalent of section 1767(a)(2) and addresses equitable relief in the context of close corporation oppression and other misconduct.[12]

At least one New Jersey court has cautioned against overgeneralizing the expectations of minority shareholders in close corporations:

"Close corporations . . . are frequently formed by individuals most aptly described as partners, These persons desire the tax benefits, the insulation from personal

---

12. In its entirety, section 14A:12-7(1)(c) reads as follows:

"In the case of a corporation having 25 or less shareholders, the directors or those in control have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees."

liability and the perpetual life that flows from the corporate form. The amassing of capital through the sale of stock to investors is at best of secondary importance. The personal relationship between shareholders, which is more or less peculiar to and usually antedates the formation of close corporations, makes it impossible to hypothesize a set of expectations that will be held in common by all minority shareholders in these corporations." *Exadaktilos v. Cinnaminson Realty Co.,* 400 A.2d 554, 560-61 (N.J. Super. Ct. Law Div. 1979), *aff'd,* 414 A.2d 994 (N.J. Super. Ct. App. Div. 1980). See also, 16A Fletcher Cyclopedia §8046.10 ("[e]ach case claiming oppression of shareholders as the basis for dissolution must be determined on its own facts").

In spite of this caveat, several New Jersey cases discuss the close corporation shareholder expectations that may be reasonable. For example, the New Jersey Supreme Court explored oppression in the context of a close corporation in *Muellenberg v. Bikon Corp.,* 669 A.2d 1382 (N.J. 1996):

"Unlike their counterparts in a publicly held corporation, shareholders in a close corporation are typically involved in the management and operation of the company. Oftentimes, these parties consist of family members or friends whose participation in the business is their principal source of employment and income. . . . Because majority shareholders have the power to dictate to the minority the manner in which the corporation is run, a minority shareholder in a close corporation becomes vulnerable when dissension develops. The controlling shareholders' voting power enables them to freeze out minority shareholders by terminating their employment,

excluding them from participation in management decision-making, and reducing their salary and other income.

"The vulnerability of minority shareholders is exacerbated by the illiquidity of their financial stake in the company. They cannot dissolve the company at will like members of a partnership, nor can they sell their shares on the open market like shareholders in a publicly held corporation. As a consequence, a shareholder challenging the majority in a close corporation is on the horns of a dilemma. The shareholder can neither profitably leave nor safely stay with the corporation. In reality, the only prospective buyer turns out to be the majority shareholder. This inability of minority shareholders to withdraw from the venture on their own terms makes it easy for controlling shareholders to exploit minority shareholders and defeat their reasonable expectations." 669 A.2d at 1386.

After noting that oppression ordinarily is shown when majority shareholders "have awarded themselves excessive compensation, furnished inadequate dividends, or misapplied and wasted corporate funds," the *Muellenberg* court went on to outline what may constitute a close corporation shareholder's reasonable expectations:

"When personal relations among the participants in a close corporation break down, the 'reasonable expectations' that participants had, for example, the expectation that their employment would be secure or that they would enjoy meaningful participation in the management of the business, become difficult, if not impossible, to fulfill. A person who buys a minority interest in a close corporation does so, not only in the hope of enjoying an increase

in the value of the shareholder's stake in the business, but for the assurance of employment in the business in a managerial position. In addition to the security of long-term employment and the prospect of financial return in the form of salary, the expectation includes a voice in the operation and management of the business and the formulation of its plans for future development." *Id.* at 1388. Cf. *Gimpel v. Bolstein,* 477 N.Y.S.2d 1014, 1019 (N.Y. Super. Ct. 1984) ("the relationship between the founders of a close corporation approximates that between partners, . . . and the 'reasonable expectations' test is indeed an examination into the spoken and unspoken understanding upon which the founders relied when entering into the venture").[13]

The description given in *Muellenberg* does not mean that showing oppression is a straightforward task for a minority shareholder. Indeed, as the *Muellenberg* court

13. Other jurisdictions are not as generous as New Jersey when determining the existence of shareholder oppression. In *Willis v. Bydalek,* 997 S.W.2d 798 (Tex. Ct. App. 1999), for example, the Texas Court of Appeals balanced the minority shareholders' reasonable expectations against the corporation's desire to run its business efficiently and held that the lock-out and firing of minority shareholders did not constitute oppression. 997 S.W.2d at 801-802. In other jurisdictions, the minority shareholder's defeated expectations must have been "central to the minority's decision to join the venture." *Gunderson v. Alliance of Computer Professionals Inc.,* 628 N.W.2d 173, 191 (Minn. Ct. App. 2001) (quoting *In re Dissolution of Kemp & Beatley Inc.,* 473 N.E.2d at 1179). Similarly, a single violation of these expectations alone may not be grounds for court action. See *Hayes v. Olmsted & Assocs. Inc.,* 21 P.3d 178, 182 (Or. Ct. App. 2001) ("the existence of one or more badges of oppression in isolation does not necessarily justify relief. Instead, we examine the pattern of conduct of those in control and the effect of that conduct on the minority to determine whether, in sum, they show oppression").

noted, a "minority shareholder's expectations must . . . be balanced against the corporation's ability to exercise its business judgment and run its business efficiently. Thus, courts should always be wary of interfering in the internal affairs of a corporation." 669 A.2d at 1387. See also, *Brenner,* 634 A.2d at 1133 (noting the necessity to "balance the need to redress the statutory violation against society's interest in maintaining functioning corporations").

The New Jersey position overall finds significant support from commentators who agree with the assessment that the exclusion of a close corporation shareholder from employment and the corporate decision-making process may interfere with the shareholder's reasonable expectations and may constitute oppression:

"A person acquiring a substantial interest in a close corporation often invests a large percentage of his personal resources to acquire that interest. Typically, he enters the corporation expecting to participate actively in the corporation's affairs as a key employee and perhaps as a director and principal officer. He may give up other employment with accumulated seniority and security features to work full-time for the corporation. He may have no income other than his salary. As a close corporation usually does not pay dividends or pays only small and infrequent dividends, a shareholder who is excluded from employment is effectively denied anything more than a token return on his investment, even though the investment may be substantial. Therefore, discharge of the shareholder-employee often produces an immediate financial crisis for him. He is forthwith deprived of his sole source of income; the majority shareholders, in or-

der to make the squeeze more effective, may cause the corporation to cancel its insurance policies on him and may try to deprive him of every economic benefit he derives from the corporation so that he may even find himself without life, accident, hospitalization or health insurance or the prospect of income when he reaches retirement age." F. Hodge O'Neal, *Oppression of Minority Shareholders: Protecting Minority Rights,* 35 Clev. St. L. Rev. 121, 126-27 (1986/1987). See also, Thompson, 38 Bus. Law. at 701 ("[s]hareholders in a close corporation usually expect employment and a meaningful role in management, as well as a return on the money paid for the shares"); Adam Chernichaw, *Oppressed Shareholders in Close Corporations: A Market-Oriented Statutory Remedy,* 16 Cardozo L. Rev. 501, 507 (1994) ("[i]nvestors in close corporations usually expect employment, a return on their capital, and a 'meaningful role in management' "). Cf. *Orchard v. Coveli,* 590 F. Supp. 1548, 1557 (W.D. Pa. 1984) (the fiduciary duty owed a minority shareholder may be breached by "restricting or precluding employment in the corporation . . . and excluding the minority from a meaningful role in the corporate decision-making"); Douglas K. Moll, *Shareholder Oppression v. Employment at Will in the Close Cooperation: The Investment Model Solution,* 1999 U. Ill. L. Rev. 517 (1999) (reconciling at will employment law with a close corporation shareholder's reasonable expectations by positing that an expectation of employment may be part of a shareholder's investment).

Experts similarly have concluded that cutting off a minority shareholder's access to corporate information may constitute oppression:

"An attempt to squeeze out a minority shareholder often includes deliberate withholding of information from the shareholder. The chance of a squeeze technique succeeding is usually improved if the squeeze remains in the dark about the affairs of the corporation and the actions of its directors and officers. The type of information withheld varies with the squeeze techniques being employed, but most commonly concerns the value of the enterprise and of an interest in it, the corporation's prospects for profitable operations in the future, the controlling shareholders' plans for the business, and any plans they may have for disposing of their interests in it. Since the public reporting and disclosure requirements of the federal securities law do not apply to close corporations, shareholders in a close corporation do not have access to sources of information available to securities holders in a public-issue corporation." O'Neal, 35 Clev. St. L. Rev. at 130. See also, *Leech,* 762 A.2d at 720 (holding that, in certain situations, it is oppressive for majority shareholders "to parse out the information or documents that the duly elected and constituted secretary/treasurer has access to"); Miller, *Note,* 12 J.L. & Com. at 81 (arguing that "withholding information relevant to the operation of the corporation as to important corporate matters" would indicate the existence of oppressive conduct). Cf. *Orchard,* 590 F. Supp. at 1557 (tactics employed against a minority shareholder to effect a squeeze out and thus breaching the fiduciary duty owed such a shareholder may include "withholding information relating to the operation of the corporation"); Robert A. Ragazzo, *Toward a Delaware Common Law of Closely Held Corporations,* 77 Wash. U. L.Q. 1099, 1115 (1999) ("denying

the minority access to corporate information [has] contributed to findings of breach of fiduciary duty in the close corporation context").

Most of Peter's allegations speak to interference with what Pennsylvania could consider his reasonable expectations. According to the complaint, the individual defendants excluded Peter from United management decisions and impeded Peter's ability to obtain United financial and other information.[14] In the context of a close corporation, these actions may qualify as oppressive in nature and may be grounds for the appointment of a custodian, if proven.

Peter relies on *Brenner* to argue that the individual defendants' rejection of the disclosure committee and supposed scheme to defraud United franchisees,[15] as well as the treatment accorded Tommy, also constituted oppressive conduct warranting the appointment of a custodian. The court disagrees.

In *Brenner,* the New Jersey Supreme Court distinguished between oppression and illegal or fraudulent conduct:

"Illegality and fraud may also frustrate a shareholder's reasonable expectations for a company but nonetheless not qualify as oppression. That is so because *oppression* is usually *directed at a minority shareholder personally,*

---

14. As discussed *supra,* the allegations regarding the termination of Peter's tenure as United's vice president are unclear. Depending on the circumstances surrounding this termination, however, it could constitute an additional act of oppression by the individual defendants.

15. Both of these actions allegedly imperiled Peter's investment in United and now form the basis for Count I in the complaint.

whereas *fraudulent or illegal conduct* can instead be *directed at solely the shareholder's investment in the corporation.* For example, misappropriation of funds within a corporation may violate a shareholder's reasonable expectations regarding the management of the company but it may not be oppressive because it is not directed specifically at a minority shareholder." 634 A.2d at 1028. (emphasis added) See also, 12B Fletcher Cyclopedia §5820.11 (noting that " 'oppression' is an expansive term covering a myriad of situations involving improper conduct that is neither 'fraudulent' or 'illegal' ").

Based on this distinction, Peter's allegations that the failure to set up the disclosure committee had negative implications for his investment in United are best considered allegations of fraud and illegality, not oppression. Ultimately, the *Brenner* court concluded that illegal and fraudulent conduct was actionable under New Jersey law, regardless of whether the minority shareholder was the target of the conduct. In this regard, however, New Jersey law is distinguishable from that of Pennsylvania. Nowhere does section 14A:12-7(1)(c) require that the controlling party's fraudulent or illegal conduct be directed toward the minority shareholders at all, let alone in a specific capacity. Indeed, under the New Jersey statute, it appears that any fraudulent and illegal misconduct may be grounds for relief, regardless of the misconduct's target.[16] Section 1767(a)(2), in contrast, mandates that the illegal or fraudulent actions be directed toward qualifying minority shareholders "in their capaci-

---

16. This contrasts with oppressive or unfair conduct, which under section 14A:12-7(1)(c) must be directed at the minority shareholders to be actionable.

ties as shareholders, directors, officers or employees."[17] Here, any illegal or fraudulent conduct that took place was directed at United franchisees, not Peter, and thus cannot serve as a basis for the claims set forth in the complaint under Pennsylvania law, even if accurate.

The alleged attempts to intimidate Tommy are also not actionable. Peter highlights the *Brenner* court's statement that "termination of the employment of the shareholder's children in certain situations may constitute oppressive conduct sufficient to constitute a violation" of New Jersey law and may violate the shareholder's reasonable expectations. 634 A.2d at 1029. Even if Pennsylvania law holds similarly, there is no indication in the complaint that Peter had any reasonable expectations with regard to the defendants' relationship with Tommy.[18] As a result, the court must conclude that the alleged fraudulent and illegal conduct, as well as the conduct directed toward Tommy and his position with United, cannot form the basis for a claim for shareholder oppression, and Count I must be dismissed. The other allegations, however, are sufficient to allow Peter's remaining claims to proceed.

---

17. While at least one commentator has noted that statutes like Pennsylvania's do not require that oppressive conduct be directed toward a shareholder qua shareholder, there has been no parallel statement with regard to fraudulent or illegal conduct. See Thompson, 48 Bus. Law. at 713-14 (rejecting the argument that an oppression statute "only protects a shareholder against oppression in his capacity as a shareholder").

18. In addition, it does not appear that Tommy's employment with United has been terminated.

## II. *The Motion To Disqualify Requires Additional Factual Development Before It Can Be Resolved*

Peter has filed the motion to disqualify, which seeks to disqualify the defendants' attorneys from representing the defendants in this matter. Because the motion to disqualify raises disputed issues of material fact, the court is instructing the parties to engage in discovery and to submit additional briefs so that this matter can be resolved.

The Pennsylvania Rules of Professional Conduct address an attorney's conflict of interest with a former client:

"A lawyer who has formerly represented a client in a matter shall not thereafter:

"(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation; or

"(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known." Pa.R.P.C. 1.9.

In *Estate of Pew*, 440 Pa. Super. 195, 655 A.2d 521(1994), the Pennsylvania Superior Court elaborated on Rule 1.9 and set forth a three-prong test for when it might apply:

"An attorney is prohibited from undertaking a representation adverse to a former client in a matter 'substantially related' to that in which the attorney previously had served the client. . . . The fact that the two representations involved similar or related facts is not, in itself,

sufficient to warrant the finding of a substantial relationship so as to disqualify the attorney from the representation, but, rather the test is whether information acquired by an attorney in his former representation is substantially related to the subject matter of subsequent representation. . . . If the attorney might have acquired confidential information related to the subsequent representation, Pennsylvania Rule of Professional Conduct 1.9 would prevent the attorney from representing the second client. . . . Confidential information gained by one member of a law firm is imputable to other members of the same law firm. . . . Therefore, a former client seeking to disqualify a law firm representing an adverse party on the basis of its past relationship with a member of the law firm has the burden of proving: *(1) that a past attorney/client relationship existed which was adverse to a subsequent representation by the law firm of the other client; (2) that the subject matter of the relationship was substantially related; (3) that a member of the law firm, as attorney for the adverse party, acquired knowledge of confidential information from or concerning the former client, actually or by operation of law."* 440 Pa. Super. at 243-44, 655 A.2d at 545-46. (citations omitted and emphasis added)[19]

Peter asserts that he, as an individual, had an attorney-client relationship with the defendants' attorneys. Because Peter has not attached a contract evidencing any relationship between himself and the defendants'

---

19. The *Pew* court observed that "[t]he test of whether an attorney has conflicting interests so as to preclude his representation of a party is not actuality of conflict, but possibility that a conflict may arise." 440 Pa. Super. at 243, 655 A.2d at 545 (citing *Middleberg v. Middleberg,* 427 Pa. 114, 233 A.2d 889 (1967)).

attorneys, the court must focus solely on whether an implied relationship existed. Pennsylvania courts have adopted the following test to determine if an attorney-client relationship has arisen by implication:

"Absent an express contract, an implied attorney/client relationship will be found if (1) the purported client sought advice or assistance from the attorney; (2) the advice sought was within the attorney's professional competence; (3) the attorney expressly or impliedly agreed to render such assistance; and (4) it is reasonable for the putative client to believe the attorney was representing him." *Atkinson v. Haug,* 424 Pa. Super. 406, 411-12, 622 A.2d 983, 986 (1993) (citing *Sheinkopf v. Stone,* 927 F.2d 1259, 1264 (1st Cir. 1991)). In addition, Pa.R.P.C. 1.13(a) states that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." This makes it clear that an attorney representing a corporation generally represents the corporation and not the corporation's shareholders, officers or directors.[20]

While Rule 1.13(a) is easily interpreted in the context of a large corporation, it is more difficult when addressing a close corporation, as noted recently by this court in *First Republic Bank v. Brand,* August term, 2000, no. 147 (C.P. Phila. April 30, 2001) (Herron, J.).[21] After a thorough and exhaustive review of the subject, the court

---

20. No Pennsylvania state cases, however, specifically address an *implied* attorney-client relationship as between a corporation's attorney and the corporation's shareholders. This distinction is important because, in a corporate setting, the question is not *whether* an attorney-client relationship has been formed but rather *with whom* the relationship has been formed.

21. Available at http://courts.phila.gov/cptcvcomp.htm.

concluded that 10 factors are of particular importance when determining whether an attorney-client relationship had been formed between a close corporation's attorney and one of the corporation's shareholders:

"The relevant case law and literature, therefore, suggest that the following criteria are helpful in determining whether a corporation's attorney has entered into an attorney-client relationship with the corporation's shareholder:

"(1) Whether the shareholder was separately represented by other counsel when the corporation was created or in connection with its affairs;

"(2) Whether the shareholder sought advice on and whether the attorney represented the shareholder in particularized or individual matters, including matters arising prior to the attorney's representation of the corporation;

"(3) Whether the attorney had access to shareholder's confidential or secret information that was unavailable to other parties;

"(4) Whether the attorney's services were billed to and paid by the corporation or the shareholder;

"(5) Whether the corporation is closely held;

"(6) Whether the shareholder could reasonably have believed that the attorney was acting as his individual attorney rather than as the corporation's attorney;

"(7) Whether the attorney affirmatively assumed a duty of representation to the shareholder by either express agreement or implication;

"(8) Whether the matters on which the attorney gave advice are within his or her professional competence;

"(9) Whether the attorney entered into a fee arrangement; and

"(10) Whether there was evidence of reliance by the shareholder on the attorney as his or her separate counsel or of the shareholder's expectation of personal representation." Slip op. at 13. (footnote omitted)

The court believes that these 10 criteria are just as relevant in analyzing the relationship between the defendants' attorneys and Peter, a United shareholder, director and officer, as they were in *Brand*.

In the motion to disqualify, Peter asserts the following to establish a past attorney-client relationship with the defendants' attorneys:

"(1) Peter met privately with Fisher as a shareholder four times in October and November 2000 to discuss his disputes with the individual defendants and related problems.

"(2) Peter spoke with Fisher as recently as November 16, 2000 with regard to the matters in dispute in this lawsuit.

"(3) Peter also discussed with Fisher non-corporate matters such as his personal financial situation and other personal family matters relating to his wife and children. This included United's treatment of Tommy.

"(4) At no time did Fisher or any of the other defendants' attorneys inform Peter that any of the information exchanged during their discussions could be used against him.

"(5) Fisher never told Peter, either orally or in writing, that his position as United's corporate counsel precluded him from meeting with or representing Peter or that there was any potential conflict of interest. Fisher also never requested that Peter sign a letter waiving such conflicts or consenting to representation.

"(6) The defendant attorneys have represented three partnerships in which Peter is a partner and have performed legal services for other members of Peter's family." Motion to disqualify at ¶¶7-9.

If true, these allegations would support the existence of an attorney-client relationship between Peter and the defendants' attorneys. Peter had no separate representation[22] and sought advice on individual matters related to his dispute with the other United shareholders. This would have given the defendants' attorneys information unavailable to other persons. While the billing situation is unclear, United is a closely held corporation, and at least some of the matters on which the defendants' attorneys advised Peter appear to be within their area of professional competence. Under these circumstances, Peter could have reasonably believed that the defendants' attorneys, and Fisher in particular, were serving as his personal attorneys.

The defendants deny the majority of Peter's allegations. Response to motion to disqualify at ¶¶7-9. In addition, the defendants also point out that Peter and the defendants' attorneys never entered into a fee arrangement and contend that the defendants' attorneys never affirmatively assumed a duty of representation.

Factual disputes such as these must be resolved through interrogatories, depositions or an evidentiary hearing, with depositions or written interrogatories being the preferred method of investigation. See Phila. Civ. R. *206.1(E); *American Housing Trust III v. Jones,* 548 Pa.

---

22. The defendants assert that Peter obtained separate representation by November 21, 2000. Even if this is so, it does not preclude finding that an attorney-client relationship existed at some earlier point in time.

311, 319-20, 696 A.2d 1181, 1185 (1997) ("[t]he trial court may not reach a determination based upon its view of the controverted facts, but must resolve the dispute by receiving evidence thereon through interrogatories, depositions, or an evidentiary hearing"); *Miltenberg & Samton Inc. v. Assicurazioni Generali, S.p.A.,* January 2000, no. 3633, slip op. at 11-12 (C.P. Phila. October 11, 2000) (Herron, J.) (citing *Luitweiler v. Northchester Corp.,* 456 Pa. 530, 535, 319 A.2d 899, 902-903 (1974); *Ambrose v. Cross Creek Condominiums,* 412 Pa. Super. 1, 13-14, 602 A.2d 864, 869 (1991) and *Slota v. Moorings Ltd.,* 343 Pa. Super. 96, 100, 494 A.2d 1, 2 (1985)).[23] Accordingly, the court is ordering that the parties take depositions as to those facts that either confirm or refute the assertion that Peter had an attorney-client relationship with the defendants' attorneys, as well as the extent and timing of such relationship. These depositions are to be completed within 45 days of the issuance of this opinion and in accordance with Pa.R.C.P. 4007.1. Once this has been accomplished and within 60 days of the issuance of this opinion, the parties are to file briefs addressing the issues surrounding the alleged relationship between Peter and the defendants' attorneys and referencing the depositions and any other relevant evidence. Once this is completed, the court will be able to proceed with its analysis under the three-prong *Pew* test. In the interim, the motion to disqualify will be held under advisement.

---

23. Available at http://courts.phila.gov/cptcvcomp.htm.

## CONCLUSION

Because even fraudulent or illegal conduct directed toward a third party cannot constitute minority shareholder oppression in a close corporation, Count I is stricken. The remaining objections asserting legal insufficiency are overruled, and the parties are ordered to engage in discovery regarding the disputed issues of material fact raised by the motion to disqualify.

## ORDER

And now, August 28, 2001, upon consideration of the preliminary objections of defendants Paul Del Borrello, Dennis Leonard, Glen Strafella and United Financial Services Group Inc. to the amended complaint of plaintiff Peter Del Borrello, the plaintiff's response thereto, the plaintiff's motion to disqualify and the defendants' response thereto, and in accordance with the memorandum opinion being filed contemporaneously with this order, it is hereby ordered and decreed as follows:

(1) Paragraphs 36 through 41 of the complaint are stricken;

(2) The preliminary objections to Count I—failure to disclose required disclosure events warranting appointment of a custodian for United Financial Pursuant to 15 Pa.C.S. §1767(a)(2) are sustained, and Count I is stricken;

(3) The remaining preliminary objections are overruled;

(4) The defendants are directed to file an answer to the amended complaint within 20 days of the date of entry of this order; and

(5) The motion to disqualify will be held under advisement for 60 days so that within 45 days, depositions

446

pursuant to Pa.R.C.P. 4007.1 may be taken to resolve the factual questions raised by the motion to disqualify. After the 45th day but on or before the 60th day, the parties shall file with this court, briefs offering any further argument and referencing the depositions or other relevant evidence.